UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OKLAHOMA

**FILED**

FEB 09 2012

Phil Lombardi, Clerk
**U.S. DISTRICT COURT**

ROBERT MYERS & MARY MYERS,       )

vs.                              )       Case No.:

THE TRAVELERS HOME AND           )       **12 CV - 0 5 6 CVE   PJC**
MARINE INSURANCE                 )
COMPANY, a foreign corporation,  )

Defendant.                       )

## COMPLAINT

COME NOW the Plaintiffs, Robert Myers and Mary Myers, by and through their undersigned counsel, Scott L. Tully of The Tully Law Firm, and for their cause of action against Defendant, state as follows:

1. The Plaintiffs, Robert and Mary Myers, are citizens and residents of Tulsa County, State of Oklahoma.

2. The Defendant, Travelers Home and Marine Insurance Company, is an insurance company with its principal place of business in Hartford, CT, and regularly does business in the State of Oklahoma, United States of America.

3. There exists complete diversity of citizenship between the parties and a dispute involving an amount in controversy exceeding $75,000.00, thereby invoking subject matter jurisdiction of this Court pursuant to 28 U.S.C. §1332.

4.  Venue is proper with this Court as all events giving rise to the causes of action contained herein occurred in Tulsa County, State of Oklahoma.

5.  Plaintiffs applied for, and purchased, a homeowner insurance policy from Defendant prior to their loss on April 25, 2011. A copy of the Declarations Page for the insurance at issue is attached hereto and incorporated herewith as Exhibit "A."

6.  Defendant issued policy number 984556235 633 1 to Plaintiffs, which provides certain benefits in the event of a homeowners loss, including loss resulting from water damage. A copy of the policy of insurance at issue is attached hereto and incorporated herewith as Exhibit "B."

7.  Immediately following the loss on April 25, 2011, Plaintiffs filed the requisite paperwork, and notified Defendant of the loss to collect the proceeds and benefits due and under the homeowner policy issued by Defendant.

8.  Upon making presentation of the claim, Defendant failed to pay any benefits due and owing under the policy and eventually denied the claim by letter on August 5, 2011. A copy of the denial letter is attached hereto and incorporated herewith as Exhibit "C."

9.  On December 30, 2011, counsel for Plaintiffs provided a letter to Defendant outlining the reasons the loss should be covered, as shown in Exhibit "D."

10. Said letter in paragraph number 9, requested Defendant respond within fourteen (14) days of the December 30, 2011.

11. Plaintiffs' counsel, as part of the December 30, 2011, cited case law on point that is analogous to Plaintiff's loss. The case of *Duensing v. State Farm Fire & Cas.. Co.,* 131 P.3d 127, (Okla. Civ. App. 2005) is attached as Exhibit "E."

12. Plaintiffs' counsel also provided an independent engineer report of Shahriyar Ebady-Nezami, P.E., employed with Associated Engineers and Inspectors, Inc. The engineer observed "(t)he interior concrete slab under south central part of the original house has dished causing the sheet rock cracks over the interior doors and openings." The engineer concluded "(t)his settlement, in our opinion, is likely due to a plumbing leak." The engineer's report of April 25, 2011 is attached as Exhibit "F."

13. Plaintiffs' counsel did not receive a response to their letter of December 30, 2011, and called the Defendant's claims adjuster on January 13, 2011 to inquire further.

14. Plaintiffs' counsel confirmed the January 13, 2011 conversation by way of letter dated January 16, 2012. See attached letter as Exhibit "G."

15. Defendant's claim adjuster advised Plaintiffs' counsel  the December 30, 2011 letter had been received and forwarded to Defendant's legal department. Defendant's claim adjuster stated that a response should be expected within two weeks andadvised a reminder would be sent to the legal department.

16. No response had been received from Defendant as of January 31, 2012.

17. By way of letter dated January 31, 2012, Plaintiffs' counsel further advised Defendant no response had been made to the initial request to review and reverse the denial of coverage. See attached letter as Exhibit "H."

18. Defendant was advised in the letter of January 31, 2012  suit would be filed as a result of its lack of good faith handling  and breach of contract.

## COUNT I:  BREACH OF CONTRACT

19. Plaintiffs reassert and restate the allegations set forth in paragraphs 1-18 as if fully set forth herein.

20. Plaintiffs allege Defendant improperly breached the insurance contract by failing to pay benefits due thereunder and denying the claim.

21. Plaintiffs have suffered economic and emotional damages as a result of this breach of contract.

## COUNT II: BAD FAITH AND BREACH OF THE DUTY OF GOOD FAITH CLAIM HANDLING

22. Plaintiffs reassert and restate the allegations set forth in paragraphs 1-21 as if fully set forth herein.

23. The improper refusal to pay policy benefits and failure to properly and thoroughly investigate Plaintiffs' claim by Defendant exhibits a lack of good faith claims handling.

24. The refusal to pay policy benefits by Defendant exhibits  bad faith claims handling conduct contrary to the laws of Oklahoma.

## COUNT III:  NEGLIGENCE AND GROSS NEGLIGENCE

25. Plaintiffs reassert and restate the allegations set forth in paragraphs 1-24 as if fully set forth herein.

26. Defendant was negligent in the claims handling process and investigation of Plaintiffs' claim submitted under Plaintiffs' homeowner insurance policy..

27. Defendant's negligence led to the improper denial of policy benefits.

28. Defendant's negligence was of such a nature and quality and was done with such carelessness so as to be willful, wanton and with reckless disregard of the contractual rights of Plaintiff and obligations of Defendant.

WHEREFORE, premises considered, Plaintiffs respectfully request this Court grant Plaintiffs judgment for all policy benefits together with punitive damages in excess of $75,000.00, along with any other such further relief as the Court deems just and reasonable including, but not limited to, reasonable attorney fees and costs and all other relief of any type or nature to which Plaintiffs may be entitled.

<div style="margin-left:40%">

Respectfully submitted,

Scott L. Tully     OBA#13606
P.O. Box 2141
Broken Arrow, OK 74011
(918) 872-8800
(866) 224-2303  Fax
tullylawfirm@gmail.com

Matthew J. Smith Esq.
*(Pro Hac Vice Admission Pending)*
Smith, Rolfes & Skavdahl Co., L.P.A
600 Vine Street, Suite 2600
Cincinnati, OH 45202
p: (513) 579-0080
f: (513) 579-0222
msmith@smithrolfes.com

</div>

ATTORNEY LIEN CLAIMED
JURY TRIAL DEMANDED

# EXHIBIT A





**POLICY CHANGE DECLARATIONS**

# Homeowners Policy

**(Named Insured)**
**Name and Mailing Address**
ROBERT MYERS
MARY MYERS
1117 N GUM AVE
BROKEN ARROW OK 74012

**Agent Information**
ALBRIGHT INS AGCY INC
P O BOX 1147
PONCA CITY, OK   74602

**The Residence premises is located at**
1117 N GUM AVE
BROKEN ARROW OK 74012

**Mortgagee Name and Address**
1. COLDWELL BANKER MORTGAGE
   ISAOA
   PO BOX 5954
   SPRINGFIELD   OH 45501
   LOAN NUMBER 7110566275

**POLICY INFORMATION**
**Homeowners Policy No.**
984556235 633 1

**Policy Period**
03/24/11 - 03/24/12   12:01 A.M.
Standard Time at the residence premises

Change Effective Date: 03/24/11
Reason for Change: Change to Mortgagee 1

No Change in Premium

**Your Insurer**

**For Claim Service Call**   1-800-CLAIM33



## OPTIONAL ENDORSEMENTS AND COVERAGES (CONTINUED)    LIMIT    PREMIUM

**Optional Endorsements**

| | | | |
|---|---|---|---|
| HO-312 | (06-06) Windstorm or Hail Percentage Deductible............... | | Included* |
| HO-455 | (06-06) Identity Fraud Expense Coverage........................ | $ | 25.00 |
| HO-493 | (06-06) Actual Cash Value Loss Settlement..................... | | Included* |
| | Windstorm or Hail Losses to Roof Surfacing | | |

## MANDATORY FORMS AND ENDORSEMENTS

HO-3     (10-06) Homeowners 3 Special Form

HO-300 OK (03-09) Special Provisions - Oklahoma



*Note:  The additional cost for any optional endorsement or coverage shown as "Included" is contained in the Total Policy Premium amount.

---

### For Your Information

For information about how Travelers compensates independent agents and brokers, please visit www.Travelers.com or call our toll free telephone number 1-866-904-8348. You may also request a written copy from Marketing at One Tower Square, 2GSA, Hartford, Connecticut 06183.

**Warning:**
Any person who knowingly, and with intent to injure, defraud, or deceive any insurer, makes any claim for the proceeds of an insurance policy containing any false, incomplete or misleading information is guilty of a felony.

**SPECIAL WINDSTORM DEDUCTIBLE APPLIES: SEE ENDORSEMENT HO-312**

Thank you for insuring with Travelers. We appreciate your business. If you have any questions about your insurance, please contact your agent or representative.

Continued on next page



## For Your Information (continued)

These declarations with policy provisions HO-3 (10-06) and any attached
endorsements form your Homeowners Insurance Policy.  Please keep them with
your policy for future reference.

# EXHIBIT B

This is to certify that this is a reproduction, from the company's records, of the insurance policy between the insured and the insuring company as described on the Declarations Page. It is a full, true and complete reproduction of the insurance policy. No insurance is afforded hereunder.

Signature _Thel Mc Tedd_

Date _9/26/11_

COVHO3



# Homeowners Policy Booklet

# from Travelers

**Especially for:**
**ROBERT MYERS**
**MARY MYERS**

**Prepared by:**
**ALBRIGHT INS AGCY INC**



# *The Contents of This Booklet*

## 1.   Your Declarations:

A summary of your coverages, amounts of insurance, and premiums for those coverages under the policy.

## 2.   Homeowners Policy:

The policy contract describing coverages, rights, and obligations.

## 3.   Endorsements:

Additional coverages or policy provisions applicable to your policy.

## 4.   Important Notices:

Information required by your state but not part of your policy provisions.

## YOUR HOMEOWNERS POLICY QUICK REFERENCE

**DECLARATIONS PAGE**

    **Your Name**
    **Location of Your Residence**
    **Policy Period**
    **Policy Coverages**
    **Limits of Liability**
    **Deductible Amounts**

**Beginning On Page**

AGREEMENT ................................................................................................ 1
DEFINITIONS .............................................................................................. 1

| SECTION I PROPERTY COVERAGES | |
|---|---|

COVERAGES ................................................................................................ 3
    Coverage A - Dwelling ............................................................... 3
    Coverage B - Other Structures ............................................... 3
    Coverage C - Personal Property .............................................. 3
    Coverage D - Loss of Use ........................................................ 5
    Additional Coverages ............................................................... 5
PERILS INSURED AGAINST ..................................................................... 10
EXCLUSIONS ............................................................................................ 12
CONDITIONS ............................................................................................ 14
    Duties After Loss ...................................................................... 14
    Loss Settlement ........................................................................ 15
    Loss Deductible ........................................................................ 16
    Policy Period .............................................................................. 17

**SECTION II LIABILITY COVERAGES**

COVERAGES ............................................................................................. 17
    Coverage E - Personal Liability ............................................... 17
    Coverage F - Medical Payments to Others .......................... 17
ADDITIONAL COVERAGES ..................................................................... 18
EXCLUSIONS ............................................................................................ 19
CONDITIONS ............................................................................................ 23
    Limit of Liability ........................................................................ 23
    Duties After Occurrence ......................................................... 23
    Policy Period .............................................................................. 23

**SECTION I and SECTION II CONDITIONS**

CONDITIONS ............................................................................................ 24
    Cancellation ............................................................................... 24
    Nonrenewal ................................................................................ 24

HO-3  (10-06)

# HOMEOWNERS 3 – SPECIAL FORM

## AGREEMENT

We will provide the insurance described in this policy in return for the premium and compliance with all applicable provisions of this policy.

## DEFINITIONS

In this policy, "you" and "your" refer to the named "insured" shown in the Declarations and the spouse if a resident of the same household. "We", "us" and "our" refer to the company providing this insurance. In addition, certain words and phrases are defined as follows:

1. "Aircraft Liability", "Hovercraft Liability", "Motor Vehicle Liability" and "Watercraft Liability", subject to the provisions in b. below, mean the following:

   a. Liability for "bodily injury" or "property damage" arising out of the:

      (1) Ownership of such vehicle or craft by an "insured";

      (2) Maintenance, occupancy, operation, use, loading or unloading of such vehicle or craft by any person;

      (3) Entrustment of such vehicle or craft by an "insured" to any person;

      (4) Failure to supervise or negligent supervision of any person involving such vehicle or craft by an "insured"; or

      (5) Vicarious liability, whether or not imposed by law, for the actions of a child or minor involving such vehicle or craft.

   b. For the purpose of this definition:

      (1) Aircraft means any contrivance used or designed for flight, except model or hobby aircraft not used or designed to carry people or cargo;

      (2) Hovercraft means a self-propelled motorized ground effect vehicle and includes, but is not limited to, flarecraft and air cushion vehicles;

      (3) Watercraft means a craft principally designed to be propelled on or in water by wind, engine power or electric motor; and

      (4) Motor vehicle means a "motor vehicle" as defined in 9. below.

2. "Bodily injury" means bodily harm, sickness or disease, including required care, loss of services and death that results.

3. "Business" means:

   a. A trade, profession or occupation engaged in on a full-time, part-time or occasional basis; or

   b. Any other activity engaged in for money or other compensation, except the following:

      (1) Volunteer activities for which no money is received other than payment for expenses incurred to perform the activity;

      (2) Providing home day care services for which no compensation is received, other than the mutual exchange of such services; or

      (3) Providing home day care services to a relative of an "insured".

4. "Employee" means an employee of an "insured", or an employee leased to an "insured" by a labor leasing firm under an agreement between an "insured" and the labor leasing firm, whose duties are other than those performed by a "residence employee".

5. "Fuel system" means:

   a. One or more containers, tanks or vessels which have a total combined fuel storage capacity of 100 or more U.S. gallons; and:

      (1) Are, or were, used to hold fuel; and

      (2) Are, or were, located on any one location;

   b. Any pumping apparatus, which includes the motor, gauge, nozzle, hose or pipes that are, or were, connected to one or more containers, tanks or vessels described in Paragraph a.;

c. Filler pipes and flues connected to one or more containers, tanks or vessels described in Paragraph **a.**;

d. A boiler, furnace or a water heater, the fuel for which is stored in a container, tank or vessel described in Paragraph **a.**;

e. Fittings and pipes connecting the boiler, furnace or water heater to one or more containers, tanks or vessels described in Paragraph **a.**; or

f. A structure that is specifically designed and built to hold escaped or released fuel from one or more containers, tanks or vessels described in Paragraph **a.**

A "fuel system" does not include any fuel tanks that are permanently affixed to a motor vehicle or watercraft owned by an "insured", used for powering the motor vehicle or watercraft and not used at any time or in any manner for "business".

6. "Fungi"

a. "Fungi" means any type or form of fungus, including mold or mildew, and any mycotoxins, spores, scents or by-products produced or released by "fungi".

b. Under Section II, this does not include any "fungi" that are, are on, or are contained in, a product or goods intended for consumption.

7. "Insured" means:

a. You and residents of your household who are:

(1) Your relatives; or

(2) Other persons under the age of 21 and in the care of any person named above.

b. A student enrolled in school full-time, as defined by the school, who was a resident of your household before moving out to attend school, provided the student is under the age of:

(1) 24 and your relative; or

(2) 21 and in your care or the care of a person described in **a.(1)** above; or

c. Any Additional Insured named in the Declarations, but only with respect to Coverages A, B, E and F and only for the "residence premises".

d. Under Section II:

(1) With respect to animals or watercraft to which this policy applies, any person or organization legally responsible for these animals or watercraft which are owned by

you or any person included in **a.** or **b.** above. "Insured" does not mean a person or organization using or having custody of these animals or watercraft in the course of any "business" or without consent of the owner; or

(2) With respect to any vehicle to which this policy applies:

(a) Persons while engaged in your employ or that of any person included in **a.** or **b.** above; or

(b) Other persons using the vehicle on an "insured location" with your consent.

Under both Sections I and II, when the word an immediately precedes the word "insured", the words an "insured" together mean one or more "insureds".

8. "Insured location" means:

a. The "residence premises";

b. The part of other premises, other structures and grounds used by you as a residence and:

(1) Which is shown in the Declarations; or

(2) Which is acquired by you during the policy period for your use as a residence;

c. Any premises used by you in connection with a premises described in **a.** and **b.** above;

d. Any part of a premises:

(1) Not owned by an "insured"; and

(2) Where an "insured" is temporarily residing;

e. Vacant land, other than farm land, owned by or rented to an "insured";

f. Land owned by or rented to an "insured" on which a one or two family dwelling is being built as a residence for an "insured";

g. Individual or family cemetery plots or burial vaults of an "insured";

h. Any part of a premises occasionally rented to an "insured" for other than "business" use;

i. Any premises owned by you and rented to others for use as a residence by not more than four families, if shown in the Declarations as an ADDITIONAL RESIDENCE RENTED TO OTHERS; or

j. Any other structure on the "residence premises" rented to others as a private residence for which a limit of liability is shown in the

Declarations for STRUCTURES RENTED TO OTHERS.

9. "Motor vehicle" means:

   a. A self-propelled land or amphibious vehicle; or

   b. Any trailer or semi-trailer which is being carried on, towed by or hitched for towing by a vehicle described in a. above.

10. "Occurrence" means an accident, including continuous or repeated exposure to substantially the same general harmful conditions, which results during the policy period, in:

   a. "bodily injury"; or

   b. "property damage".

11. "Property Damage" means physical injury to, destruction of, or loss of use of tangible property.

12. "Residence employee" means:

   a. An employee of an "insured", or an employee leased to an "insured" by a labor leasing firm under an agreement between an "insured" and the labor leasing firm, if the employee's duties are related to the maintenance or use of the "residence premises", including household or domestic services; or

   b. One who performs similar duties elsewhere not related to the "business" of an "insured."

A "residence employee" does not include a temporary employee who is furnished to an "insured" to substitute for a permanent "residence employee" on leave or to meet seasonal or short-term workload conditions.

13. "Residence premises" means:

   a. The one family dwelling where you reside; or

   b. The two, three or four family dwelling where you reside in at least one of the family units;

and which is shown as the "residence premises" in the Declarations.

"Residence premises" also includes other structures and grounds at that location.

---

## SECTION I - PROPERTY COVERAGES

---

### COVERAGE A - DWELLING

1. We cover:

   a. The dwelling on the "residence premises" shown in the Declarations, including structures attached to the dwelling; and

   b. Materials and supplies located on or next to the "residence premises" used to construct, alter or repair the dwelling or other structures on the "residence premises".

2. We do not cover land, including land on which the dwelling is located.

### COVERAGE B - OTHER STRUCTURES

1. We cover other structures on the "residence premises" set apart from the dwelling by clear space. This includes structures connected to the dwelling by only a fence, utility line, or similar connection.

2. We do not cover:

   a. Land, including land on which the other structures are located;

   b. Other structures rented or held for rental to any person not a tenant of the dwelling, unless used solely as a private garage. However, we do cover other structures rented to others as a private residence for which a limit of liability is shown in the Declarations for STRUCTURES RENTED TO OTHERS;

   c. Other structures from which any "business" is conducted; or

   d. Other structures used to store "business" property. However, we do cover a structure that contains "business" property solely owned by an "insured" or a tenant of the dwelling provided that "business" property does not include gaseous or liquid fuel, other than fuel in a permanently installed fuel tank of a vehicle or craft parked or stored in the structure.

### COVERAGE C - PERSONAL PROPERTY

1. **Covered Property.** We cover personal property owned or used by an "insured" while it is anywhere in the world. At your request, we will cover personal property owned by:

   a. Others while the property is on the part of the "residence premises" occupied by an "insured"; or

   b. A guest or a "residence employee", while the property is in any residence occupied by an "insured".

This request may be made after a loss.

2. **Limit For Property At Other Residences.** Our limit of liability for personal property usually located at an "insured's" residence, other than the "residence premises", is 10% of the limit of liability for Coverage C, or $1,000, whichever is greater. However, this limitation does not apply to personal property:

   a. Moved from the "residence premises" because it is being repaired, renovated or rebuilt and is not fit to live in or store property in; or

   b. In a newly acquired principal residence for 30 days from the time you begin to move the property there.

3. **Special Limits of Liability.** The special limit for each category described below is the greater of the limit shown below or the special limit for such category, if any, shown in the Declarations. Such limit is the total limit for each loss for all property in that category. These special limits do not increase the Coverage C limit of liability.

   a. $200 on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum other than platinumware, coins, medals, scrip, stored value cards and smart cards.

   b. $1,500 on securities, accounts, deeds, evidence of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets and stamps. This dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.

      This limit includes the cost to research, replace or restore the information from the lost or damaged material.

   c. $1,500 on watercraft of all types, including their trailers, furnishings, equipment and outboard engines or motors.

   d. $1,500 on trailers or semitrailers not used with watercraft of all types.

   e. $1,500 for loss by theft of jewelry, watches, furs, precious and semiprecious stones.

   f. $2,500 for loss by theft of firearms and related equipment.

   g. $2,500 for loss by theft of silverware, silver-plated ware, goldware, gold-plated ware, platinumware, platinum-plated ware and pewterware. This includes flatware, hollowware, tea sets, trays and trophies made of or including silver, gold, platinum or pewter.

   h. $5,000 on property, on the "residence premises", used primarily for "business" purposes.

   i. $1,500 on property, away from the "residence premises", used primarily for "business" purposes. However, this limit does not apply to loss to electronic apparatus and accessories described in category j. below.

   j. $1,500 on electronic apparatus and accessories, while in or upon a "motor vehicle", but only if the apparatus is equipped to be operated by power from the "motor vehicle's" electrical system while still capable of being operated by other power sources.

   k. $250 on tapes, records, discs or other media that can be used with any electronic apparatus, while in or upon a "motor vehicle".

4. **Property Not Covered**

   We do not cover:

   a. Articles separately described and specifically insured, regardless of the limit for which they are insured, in this or other insurance;

   b. Animals, birds or fish;

   c. "Motor vehicles".

      (1) This includes:

         (a) Their accessories, equipment and parts; or

         (b) Electronic apparatus and accessories designed to be operated solely by power from the electrical system of the "motor vehicle".

         The exclusion of property described in (a) and (b) above applies only while such property is in or upon the "motor vehicle".

      (2) We do cover "motor vehicles" not required to be registered for use on public roads or property which are:

         (a) Used to service an "insured's" residence; or

         (b) Designed to assist the handicapped;

   d. Aircraft meaning any contrivance used or designed for flight, including any parts whether or not attached to the aircraft.

      We do cover model or hobby aircraft not used or designed to carry people or cargo;

   e. Hovercraft and parts. Hovercraft means a self-propelled motorized ground effect vehicle and includes, but is not limited to, flarecraft and air cushion vehicles;

f.   Property of roomers, boarders and other ten-ants, except property of roomers and board-ers related to an "insured";

g.   Property in an apartment regularly rented or held for rental to others by an "insured", ex-cept as provided under Additional Coverage 11. Landlord's Furnishings;

h.   Property rented or held for rental to others off the "residence premises";

i.   "Business" data, including such data stored in:

   (1)  Books of account, drawings or other pa-per records; or

   (2)  Computers and related equipment.

   We do cover the cost of blank recording or storage media, and of prerecorded computer programs available on the retail market;

j.   Credit cards, electronic fund transfer cards or access devices used solely for deposit, with-drawal or transfer of funds except as provided in Additional Coverage 7. Credit Card, Elec-tronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money;

k.   Grave markers, except as provided in Addi-tional Coverage 13. Grave Markers; or

l.   Water or steam.

## COVERAGE D - LOSS OF USE

The limit of liability for Coverage D is the total limit for the coverages in 1. Additional Living Expense, 2. Fair Rental Value and 3. Civil Authority Prohibits Use be-low.

1.   **Additional Living Expense.** If a loss covered under Section I makes that part of the "residence premises" where you reside not fit to live in, we cover any necessary increase in living expenses incurred by you so that your household can main-tain its normal standard of living. However, addi-tional living expense due to "fungi", other microbes or rot remediation will not be paid in ad-dition to any amounts paid or payable under Addi-tional Coverage 16. Limited "Fungi", Other Microbes Or Rot Remediation.

   Payment will be for the shortest time required to repair or replace the damage or, if you perma-nently relocate, the shortest time required for your household to settle elsewhere.

2.   **Fair Rental Value.** If a loss covered under Sec-tion I makes that part of the "residence premises" rented to others or held for rental by you not fit to live in, we cover the fair rental value of such premises less any expenses that do not continue while it is not fit to live in. However, fair rental value due to "fungi", other microbes or rot reme-diation will not be paid in addition to any amounts paid or payable under Additional Coverage 16. Limited "Fungi", Other Microbes Or Rot Remedia-tion.

   Payment will be for the shortest time required to repair or replace such premises.

   Written proof that part of the "residence premises" is rented, was held for rental at the time of loss or has been rented within the 24 months prior to the date of loss is required.

3.   **Civil Authority Prohibits Use.** If a civil authority prohibits you from use of the "residence prem-ises" as a result of direct physical damage to neighboring premises caused by a Peril Insured Against under this policy, we cover resulting 1. Additional Living Expense and 2. Fair Rental Value as provided above for no more than two weeks. Neighboring premises means a premises in sufficient proximity to the "residence premises" that there exists a reasonable risk that the peril affecting the neighboring premises could endan-ger either the "residence premises" or the safety of its occupants while in the "residence premises".

4.   **Loss Or Expense Not Covered.** We do not cover loss or expense due to cancellation of a lease or agreement.

The periods of time under 1. Additional Living Ex-pense, 2. Fair Rental Value and 3. Civil Authority Pro-hibits Use above are not limited by expiration of this policy.

## ADDITIONAL COVERAGES

Unless otherwise stated:
The following coverages are additional insurance; and
They are subject to your deductible.

1.   **Debris Removal.** We will pay your reasonable expense for the removal of:

   a.   Debris of covered property if a Peril Insured Against that applies to the damaged property causes the loss; or

   b.   Ash, dust or particles from a volcanic eruption that has caused direct loss to a building or property contained in a building.

   This expense is included in the limit of liability that applies to the damaged property. If the amount to be paid for the actual damage to the property plus the debris removal expense is more than the limit of liability for the damaged property, an additional 5% of that limit is available for such expense.

We do not pay for the removal of trees except as provided under **2. Tree Removal** below.

2. **Tree Removal.** We will pay your reasonable expense, up to $1,000, for the removal of one or more trees fallen on the "residence premises" as a result of a Peril Insured Against, provided the tree(s):

   a. Damage(s) a covered structure; or

   b. Do(es) not damage a covered structure, but:

      (1) Block(s) a driveway on the "residence premises" which prevent(s) a "motor vehicle", that is registered for use on public roads or property, from entering or leaving the "residence premises"; or

      (2) Block(s) a ramp or other fixture designed to assist a handicapped person to enter or leave the dwelling building.

   The $1,000 limit is the most we will pay in any one loss regardless of the number of fallen trees. No more than $500 of this limit will be paid for the removal of any one tree.

3. **Reasonable Repairs.**

   a. We will pay the reasonable cost incurred by you for the necessary measures taken solely to protect covered property that is damaged by a Peril Insured Against from further damage.

   b. If the measures taken involve repair to other damaged property, we will pay only if that property is covered under this policy and the damage is caused by a Peril Insured Against.

   c. This coverage does not increase the limit of liability that applies to the covered property; or

   d. Relieve you of your duties, in case of a loss to covered property, described in **2.d.** under Section I – Conditions.

4. **Trees, Shrubs And Other Plants.** We cover trees, shrubs, plants or lawns, on the "residence premises", for loss caused by the following Perils Insured Against:

   a. Fire or Lightning;

   b. Explosion;

   c. Riot or Civil Commotion;

   d. Aircraft;

   e. Vehicles not owned or operated by a resident of the "residence premises";

   f. Vandalism or Malicious Mischief; or

   g. Theft.

   We will pay up to 5% of the limit of liability that applies to the dwelling for all trees, shrubs, plants or lawns. No more than $500 of this limit will be paid for any one tree, shrub or plant. We do not cover property grown for "business" purposes.

5. **Fire Department Service Charge.** We will pay up to $500 for your liability assumed by contract or agreement for fire department charges incurred when the fire department is called to save or protect covered property from a Peril Insured Against. We do not cover fire department service charges if the property is located within the limits of the city, municipality or protection district furnishing the fire department response.

   No deductible applies to this coverage.

6. **Property Removed.** We insure covered property against direct loss from any cause while being removed from a premises endangered by a Peril Insured Against and for no more than 30 days while removed. This coverage does not change the limit of liability that applies to the property being removed.

7. **Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money.**

   a. We will pay up to the greater of $1,000, or the higher amount, if any, shown in the Declarations for CREDIT CARD, for:

      (1) The legal obligation of an "insured" to pay because of the theft or unauthorized use of credit cards issued to or registered in an "insured's" name;

      (2) Loss resulting from theft or unauthorized use of an electronic fund transfer card or access device used for deposit, withdrawal or transfer of funds, issued to or registered in an "insured's" name;

      (3) Loss to an "insured" caused by forgery or alteration of any check or negotiable instrument; and

      (4) Loss to an "insured" through acceptance in good faith of counterfeit United States or Canadian paper currency.

      No deductible applies to this coverage.

   b. All loss resulting from a series of acts:

      (1) Committed by any one person or group of persons acting in concert; or

(2) In which any one person or group of persons acting in concert is concerned or implicated;

Is considered to be one loss.

c. We do not cover:

(1) Use of a credit card, electronic fund transfer card or access device:

(a) By a resident of your household;

(b) By a person who has been entrusted with either type of card or access device; or

(c) If an "insured" has not complied with all terms and conditions under which the cards are issued or the devices accessed; or

(2) Loss arising out of "business" use or dishonesty of an "insured".

d. If the coverage in a. applies, the following defense provisions also apply:

(1) We may investigate and settle any claim or suit that we decide is appropriate. Our duty to defend a claim or suit ends when the amount we pay for the loss equals our limit of liability.

(2) If a suit is brought against an "insured" for liability under a.(1) or (2) above, we will provide a defense at our expense by counsel of our choice.

(3) We have the option to defend at our expense an "insured" or an "insured's" bank against any suit for the enforcement of payment under a.(3) above.

8. **Loss Assessment.**

a. We will pay up to $1,000 for your share of loss assessment charged during the policy period against you, as owner or tenant of the "residence premises", by a corporation or association of property owners. The assessment must be made as a result of direct loss to property, owned by all members collectively, of the type that would be covered by this policy if owned by you, caused by a Peril Insured Against under Coverage A, other than:

(1) Earthquake; or

(2) Land shock waves or tremors before, during or after a volcanic eruption.

The limit of $1,000 is the most we will pay with respect to any one loss, regardless of the number of assessments. We will apply only

one deductible, per unit, to the total amount of any one loss to the property described above, regardless of the number of assessments.

b. We do not cover assessments charged against you or a corporation or association of property owners by any governmental body.

c. Section I Condition 17. Policy Period does not apply to this coverage.

9. **Collapse.**

a. With respect to this Additional Coverage:

(1) Collapse means an abrupt falling down or caving in of a building or any part of a building with the result that the building or part of the building cannot be occupied for its current intended purpose.

(2) A building or any part of a building that is in danger of falling down or caving in is not considered to be in a state of collapse.

(3) A part of a building that is standing is not considered to be in a state of collapse even if it has separated from another part of the building.

(4) A building or any part of a building that is standing is not considered to be in a state of collapse even if it shows evidence of cracking, bulging, sagging, bending, leaning, settling, shrinkage or expansion.

b. We insure for direct physical loss to covered property involving collapse of a building or any part of a building if the collapse was caused by one or more of the following:

(1) The Perils Insured Against named under Coverage C;

(2) Decay that is hidden from view, unless the presence of such decay is known to an "insured" prior to collapse or there are visible signs of water damage and the "insured" has not taken prompt action to prevent further damage;

(3) Insect or vermin damage that is hidden from view, unless the presence of such damage is known to an "insured" prior to collapse;

(4) Weight of contents, equipment, animals or people;

(5) Weight of rain which collects on a roof; or

(6) Use of defective material or methods in construction, remodeling or renovation if

the collapse occurs during the course of the construction, remodeling or renovation.

c. Loss to an awning, fence, patio, deck, pavement, swimming pool, underground pipe, flue, drain, cesspool, septic tank, foundation, retaining wall, bulkhead, pier, wharf or dock is not included under **b.(2)** through **(6)** above, unless the loss is a direct result of the collapse of a building or any part of a building.

d. This coverage does not increase the limit of liability that applies to the damaged covered property.

### 10. Glass Or Safety Glazing Material.

a. We cover:

(1) The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window;

(2) The breakage of glass or safety glazing material which is part of a covered building, storm door or storm window when caused directly by earth movement; and

(3) The direct physical loss to covered property caused solely by the pieces, fragments or splinters of broken glass or safety glazing material which is part of a building, storm door or storm window.

b. This coverage does not include loss:

(1) To covered property which results because the glass or safety glazing material has been broken, except as provided in **a.(3)** above; or

(2) On the "residence premises" if the dwelling has been vacant for more than 60 consecutive days immediately before the loss, except when the breakage results directly from earth movement as provided in **a.(2)** above. Vacant means substantially empty of personal property necessary to sustain normal occupancy. A dwelling being constructed is not considered vacant.

c. This coverage does not increase the limit of liability that applies to the damaged property.

**11. Landlord's Furnishings.** We will pay up to $2,500 for your appliances, carpeting and other household furnishings, in each apartment on the "residence premises" regularly rented or held for rental to others by an "insured", for loss caused by a Peril Insured Against in Coverage C, other than Theft.

This limit is the most we will pay in any one loss regardless of the number of appliances, carpeting or other household furnishings involved in the loss.

This coverage does not increase the limit of liability applying to the damaged property.

### 12. Ordinance or Law.

a. You may use up to the greater of 10%, or the higher percentage, if any, shown in the Declarations for ORDINANCE OR LAW, of the limit of liability that applies to Coverage A for the increased costs you incur due to the enforcement of any ordinance or law which requires or regulates:

(1) The construction, demolition, remodeling, renovation or repair of that part of a covered building or other structure damaged by a Peril Insured Against;

(2) The demolition and reconstruction of the undamaged part of a covered building or other structure, when that building or other structure must be totally demolished because of damage by a Peril Insured Against to another part of that covered building or other structure; or

(3) The remodeling, removal or replacement of the portion of the undamaged part of a covered building or other structure necessary to complete the remodeling, repair or replacement of that part of the covered building or other structure damaged by a Peril Insured Against.

b. You may use all or part of this ordinance or law coverage to pay for the increased costs you incur to remove debris resulting from the construction, demolition, remodeling, renovation, repair or replacement of property as stated in **a.** above.

c. We do not cover:

(1) The loss in value to any covered building or other structure due to the requirements of any ordinance or law; or

(2) The costs to comply with any ordinance or law which requires any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants in or on any covered building or other structure.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids,

alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

d. The most we will pay for any increased costs to comply with any ordinance or law that becomes effective after the date of loss is $5,000.

13. **Grave Markers.** We will pay up to $5,000 for grave markers, including mausoleums, on or away from the "residence premises" for loss caused by a Peril Insured Against in Coverage C.

This coverage does not increase the limits of liability that apply to the damaged covered property.

14. **Refrigerated Products Coverage.** We insure, up to $500, covered property stored in freezers or refrigerators on the "residence premises" for direct loss caused by:

a. Loss of power to the refrigeration unit. Loss of power means the complete or partial interruption of electric power due to conditions beyond an "insured's" control. Loss of power must be caused by damage to:

(1) Generating equipment; or

(2) Transmitting equipment; or

b. Mechanical failure of the unit which stores the property.

Coverage will apply only if you have maintained the refrigeration unit in proper working condition immediately prior to the loss.

This coverage does not increase the limit of liability for Coverage C.

We will pay only that part of the total of all loss payable that exceeds $100. No other deductible applies to this coverage.

The Power Failure exclusion does not apply to this coverage.

15. **Inflation Coverage.** We may adjust the limits of liability for Coverages A, B, C and D at the beginning of each successive policy term to reflect increases in the cost of insured property. The amount of such increase will be based on the data provided by the appraisal company shown in the Declarations. Payment of the required premium when due for the successive policy term will be sufficient to indicate your acceptance of the adjusted limits.

We will also adjust the limits of liability at the time of a loss by the same percentage pro rated from the effective date of the policy period or the effective date of change if you have requested a

change to the limit of liability for Coverage A during the policy period.

16. **Limited "Fungi", Other Microbes Or Rot Remediation.**

a. If a loss caused by a Peril Insured Against results in "fungi", other microbes or rot, we will pay for:

(1) Remediation of the "fungi", other microbes or rot. This includes payment for the reasonable and necessary cost to:

(a) Remove the "fungi", other microbes or rot from covered property or to repair, restore or replace that property; and

(b) Tear out and replace any part of the building as needed to gain access to the "fungi", other microbes or rot;

(2) Any reasonable and necessary increase in living expense you incur:

(a) So that your household can maintain its normal standard of living; or

(b) Loss of fair rental value;

if the "fungi", other microbes or rot makes the "residence premises" not fit to live in; and

(3) Any reasonable and necessary testing or monitoring of air or property to confirm the absence, presence or level of the "fungi", other microbes or rot, whether performed prior to, during or after removal, repair, restoration or replacement.

b. We will pay under this additional coverage only if:

(1) The covered loss occurs during the policy period;

(2) All reasonable means were used to save and preserve the property at the time of and after the covered loss; and

(3) We receive prompt notice of the covered cause of loss that is alleged to have resulted in "fungi", other microbes or rot.

c. The most we will pay under this additional coverage is the limit of liability shown in the Declarations for Limited "Fungi", Other Microbes Or Rot Remediation. This is the most we will pay for the total of all loss or costs regardless of the:

(1) Number of locations or items of property insured under this policy; or



(2) Number of losses or claims made.

d. This coverage does not increase the limit of liability that applies to the damaged property.

---

## SECTION I - PERILS INSURED AGAINST

### COVERAGE A – DWELLING AND COVERAGE B – OTHER STRUCTURES

1. We insure against risk of direct physical loss to property described in Coverages A and B.

2. We do not insure, however, for loss:

   a. Excluded under Section I – Exclusions;

   b. Involving collapse or danger of collapse, except as provided in Additional Coverage 9. Collapse under Section I – Property Coverages; or

   c. Caused by:

      (1) Freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion does not apply if you have used reasonable care to:

         (a) Maintain heat in the building; or

         (b) Shut off the water supply and drain all systems and appliances of water.

         However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

         For purposes of this provision a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment;

      (2) Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

         (a) Fence, pavement, patio or swimming pool;

         (b) Footing, foundation, bulkhead, wall, or any other structure or device that supports all or part of a building, or other structure;

         (c) Retaining wall or bulkhead that does not support all or part of a building or other structure; or

         (d) Pier, wharf or dock;

      (3) Theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

      (4) Vandalism and malicious mischief, and any ensuing loss caused by any intentional and wrongful act committed in the course of the vandalism or malicious mischief, if the dwelling has been vacant for more than 60 consecutive days immediately before the loss. Vacant means substantially empty of personal property necessary to sustain normal occupancy. A dwelling being constructed is not considered vacant;

      (5) Constant or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more; or

      (6) Any of the following:

         (a) Wear and tear, marring, deterioration;

         (b) Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

         (c) Smog, rust or other corrosion;

         (d) Smoke from agricultural smudging or industrial operations;

         (e) Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against named under Coverage C.

            Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

         (f) Settling, shrinking, bulging or expansion, including resultant cracking, of

bulkheads, pavements, patios, footings, foundations, walls, floors, roofs or ceilings;

(g) Birds, vermin, rodents, or insects; or

(h) Animals owned or kept by an "insured".

**Exception To c.(6)**

Unless the loss is otherwise excluded, we cover loss to property covered under Coverage A or B resulting from an accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance on the "residence premises". This includes the cost to tear out and replace any part of a building, or other structure, on the "residence premises", but only when necessary to repair the system or appliance. However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to a building on the "residence premises".

We do not cover loss to the system or appliance from which this water or steam escaped.

For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, down spout or similar fixtures or equipment.

Under **2.b.** and **c.** above, any ensuing loss to property described in Coverages A and B not excluded by any other provision in this policy is covered.

## COVERAGE C – PERSONAL PROPERTY

We insure for direct physical loss to the property described in Coverage C caused by any of the following perils, unless the loss is excluded in Section I - Exclusions.

**1. Fire or lightning.**

**2. Windstorm or hail.**

This peril includes loss to watercraft of all types and their trailers, furnishings, equipment, and outboard engines or motors, only while inside a fully enclosed building.

This peril does not include loss to property contained in a building caused by rain, snow, sleet, sand or dust unless the direct force of wind or hail damages the building, causing an opening in a roof or wall and the rain, snow, sleet, sand or dust enters through this opening.

**3. Explosion.**

**4. Riot or civil commotion.**

**5. Aircraft.**

This peril includes self-propelled missiles and spacecraft.

**6. Vehicles.**

**7. Smoke.**

This peril means sudden and accidental damage from smoke, including the emission or puffback of smoke, soot, fumes or vapors from a boiler, furnace or related equipment.

This peril does not include loss caused by smoke from agricultural smudging or industrial operations.

**8. Vandalism or malicious mischief.**

**9. Theft.**

a. This peril includes attempted theft and loss of property from a known place when it is likely that the property has been stolen.

b. This peril does not include loss caused by theft:

(1) Committed by an "insured";

(2) In or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

(3) From that part of a "residence premises" rented by an "insured" to someone other than another "insured"; or

(4) That occurs off the "residence premises" of:

(a) Trailers, semitrailers and campers;

(b) Watercraft of all types, and their furnishings, equipment and outboard engines or motors; or

(c) Property while at any other residence owned by, rented to, or occupied by an "insured", except while an "insured" is temporarily living there. Property of an "insured" who is a student is covered while at the residence the student occupies to attend school as long as the student has been there at any time during the 60 days immediately before the loss.

### 10. Falling Objects.

This peril does not include loss to property contained in a building unless the roof or an outside wall of the building is first damaged by a falling object. Damage to the falling object itself is not included.

### 11. Weight Of Ice, Snow Or Sleet.

This peril means weight of ice, snow or sleet which causes damage to property contained in a building.

### 12. Accidental Discharge Or Overflow Of Water Or Steam.

a. This peril means accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or from within a household appliance.

b. This peril does not include loss:

(1) To the system or appliance from which the water or steam escaped;

(2) Caused by or resulting from freezing except as provided in Peril Insured Against 14. Freezing; or

(3) On the "residence premises" caused by accidental discharge or overflow which occurs off the "residence premises";

c. In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

d. Section I – Exclusion 3. Water Damage, Paragraphs a. and c. that apply to surface water and water below the surface of the ground do not apply to loss by water covered under this peril.

### 13. Sudden And Accidental Tearing Apart, Cracking, Burning Or Bulging.

This peril means sudden and accidental tearing apart, cracking, burning or bulging of a steam or hot water heating system, an air conditioning or automatic fire protective sprinkler system, or an appliance for heating water.

We do not cover loss caused by or resulting from freezing under this peril.

### 14. Freezing.

a. This peril means freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance but only if you have used reasonable care to:

(1) Maintain heat in the building; or

(2) Shut off the water supply and drain all systems and appliances of water.

However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

b. In this peril, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment.

### 15. Sudden And Accidental Damage From Artificially Generated Electrical Current.

This peril does not include loss to tubes, transistors, electronic components or circuitry that are a part of appliances, fixtures, computers, home entertainment units or other types of electronic apparatus.

### 16. Volcanic Eruption.

This peril does not include loss caused by earthquake, land shock waves or tremors.

---

## SECTION I - EXCLUSIONS

A. We do not insure for loss caused directly or indirectly by any of the following. Such loss is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss. These exclusions apply whether or not the loss event results in widespread damage or affects a substantial area.

1. **Ordinance or Law**, meaning any ordinance or law:

a. Requiring or regulating the construction, demolition, remodeling, renovation or repair of property, including removal of any resulting debris. This exclusion A.1.a. does not apply to the amount of coverage

that may be provided for under Additional Coverage 12. Ordinance or Law;

b. The requirements of which result in a loss in value to property.

c. Requiring any "insured" or others to test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants.

Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

This exclusion A.1. applies whether or not the property has been physically damaged.

2. **Earth Movement,** meaning:

a. Earthquake including land shock waves or tremors before, during or after a volcanic eruption;

b. Landslide; mudslide, or mudflow;

c. Subsidence or sinkhole; or

d. Any other earth movement including earth sinking, rising or shifting;

caused by or resulting from human or animal forces or any act of nature, unless direct loss by fire or explosion ensues and then we will pay only for the ensuing loss.

This Exclusion A.2. does not apply to loss by theft.

3. **Water Damage,** meaning:

a. Flood, surface water, waves, tidal water, overflow of a body of water, or spray from any of these, whether or not driven by wind;

b. Water or water-borne material which backs up through sewers or drains or which overflows or is discharged from a sump, sump pump or related equipment; or

c. Water or water-borne material below the surface of the ground, including water which exerts pressure on or seeps or leaks through a building, sidewalk, driveway, foundation, swimming pool or other structure;

caused by or resulting from human or animal forces or any act of nature.

Direct loss by fire, explosion or theft resulting from water damage is covered.

4. **Power Failure,** meaning the failure of power or other utility service if the failure takes place off the "residence premises". But, if the failure results in a loss from a Peril Insured Against, on the "residence premises", we will pay for the loss caused by that peril.

5. **Neglect,** meaning neglect of an "insured" to use all reasonable means to save and preserve property at and after the time of a loss.

6. **War.** War includes the following and any consequence of any of the following:

a. Undeclared war, civil war, insurrection, rebellion or revolution;

b. Warlike act by a military force or military personnel; or

c. Destruction, seizure or use for a military purpose.

Discharge of a nuclear weapon will be deemed a warlike act even if accidental.

7. **Nuclear Hazard,** to the extent set forth in the Nuclear Hazard Clause of Section I - Conditions.

8. **Intentional Loss,** meaning any loss arising out of any act an "insured" commits or conspires to commit with the intent to cause a loss.

In the event of such loss, no "insured" is entitled to coverage, even "insureds" who did not commit or conspire to commit the act causing the loss.

9. **Governmental Action,** meaning the destruction, confiscation or seizure of property described in Coverage A, B or C by order of any governmental or public authority.

This exclusion does not apply to such acts ordered by any governmental or public authority that are taken at the time of a fire to prevent its spread, if the loss caused by fire would be covered under this policy.

10. **"Fungi", Other Microbes or Rot,** meaning any loss or cost resulting from, arising out of, caused by, consisting of, or related to, "fungi", other microbes or rot. This exclusion does not apply to:

a. "Fungi", other microbes or rot remediation coverage that may be afforded under Additional Coverage 16. Limited "Fungi", Other Microbes Or Rot Remediation; or

   b. "Fungi", other microbes or rot that results from fire or lightning.

**B.** We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded by any other provision in this policy is covered.

   1. Weather conditions. However, this exclusion applies only if weather conditions contribute in any way with a cause or event excluded in **A.** above to produce the loss.

   2. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

   3. Faulty, inadequate or defective:

   a. Planning, zoning, development, surveying, siting;

   b. Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

   c. Materials used in repair, construction, renovation or remodeling; or

   d. Maintenance;

   of part or all of any property whether on or off the "residence premises".

---

## SECTION I - CONDITIONS

1. **Insurable Interest and Limit of Liability.** Even if more than one person has an insurable interest in the property covered, we will not be liable in any one loss:

   a. To an "insured" for more than the amount of such "insured's" interest at the time of loss; or

   b. For more than the applicable limit of liability.

2. **Duties After Loss.** In case of a loss to covered property, we have no duty to provide coverage under this policy if the failure to comply with the following duties is prejudicial to us. These duties must be performed either by you, an "insured" seeking coverage, or a representative of either.

   a. Give us prompt notice;

   b. Notify the police in case of loss by theft;

   c. Notify the credit card or electronic fund transfer card or access device company in case of loss as provided for in Additional Coverage **7.** Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money;

   d. Protect the property from further damage. If repairs to the property are required, you must:

      (1) Make reasonable and necessary repairs to protect the property; and

      (2) Keep an accurate record of repair expenses;

   e. Cooperate with us in the investigation of a claim;

   f. Prepare an inventory of damaged personal property showing the quantity, description, actual cash value and amount of loss. Attach all bills, receipts and related documents that justify the figures in the inventory;

   g. As often as we reasonably require:

      (1) Show the damaged property;

      (2) Provide us with records and documents we request and permit us to make copies; and

      (3) Submit to examination under oath, while not in the presence of another "insured", and sign the same;

   h. Send to us, within 60 days after our request, your signed, sworn proof of loss which sets forth, to the best of your knowledge and belief:

      (1) The time and cause of loss;

      (2) The interest of all "insureds" and all others in the property involved and all liens on the property;

      (3) Other insurance which may cover the loss;

      (4) Changes in title or occupancy of the property during the term of the policy;

      (5) Specifications of damaged buildings and detailed repair estimates;

      (6) The inventory of damaged personal property described in **f.** above;

(7) Receipts for additional living expenses incurred and records that support the fair rental value loss; and

(8) Evidence or affidavit that supports a claim under Additional Coverage 7. Credit Card, Electronic Fund Transfer Card Or Access Device, Forgery And Counterfeit Money, stating the amount and cause of loss.

3. **Loss Settlement.** In this Condition 3., the terms "cost to repair or replace" and "replacement cost" do not include the increased costs incurred to comply with the enforcement of any ordinance or law, except to the extent that coverage for these increased costs is provided in Additional Coverage 12. Ordinance Or Law. Covered property losses are settled as follows:

   a. Property of the following types:

      (1) Personal property;

      (2) Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment, whether or not attached to buildings;

      (3) Structures that are not buildings; and

      (4) Grave markers, including mausoleums;

   at actual cash value at the time of loss but not more than the amount required to repair or replace.

   b. Buildings covered under Coverage A or B at replacement cost without deduction for depreciation, subject to the following:

      (1) If, at the time of loss, the amount of insurance in this policy on the damaged building is 80% or more of the full replacement cost of the building immediately before the loss, we will pay the cost to repair or replace, after application of any deductible and without deduction for depreciation, but not more than the least of the following amounts:

         (a) The limit of liability under this policy that applies to the building;

         (b) The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or

         (c) The necessary amount actually spent to repair or replace the damaged building.

If the building is rebuilt at a new premises, the cost described in (b) above is limited to the cost which would have been incurred if the building had been built at the original premises.

   (2) If, at the time of loss, the amount of insurance in this policy on the damaged building is less than 80% of the full replacement cost of the building immediately before the loss, we will pay the greater of the following amounts, but not more than the limit of liability under this policy that applies to the building:

      (a) The actual cash value of that part of the building damaged; or

      (b) That proportion of the cost to repair or replace, after application of any deductible and without deduction for depreciation, that part of the building damaged, which the total amount of insurance in this policy on the damaged building bears to 80% of the replacement cost of the building.

   (3) To determine the amount of insurance required to equal 80% of the full replacement cost of the building immediately before the loss, do not include the value of:

      (a) Excavations, footings, foundations, piers, or any other structures or devices that support all or part of the building, which are below the undersurface of the lowest basement floor;

      (b) Those supports described in (a) above which are below the surface of the ground inside the foundation walls, if there is no basement; and

      (c) Underground flues, pipes, wiring and drains.

   (4) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete. Once actual repair or replacement is complete, we will settle the loss as noted in b.(1) and b.(2) above.

   However, if the cost to repair or replace the damage is less than $2,500, we will settle the loss as noted in b.(1) and b.(2) above whether or not actual repair or replacement is complete.

   (5) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss to buildings on an actual cash value basis. You

HO-3 (10-06)

may then make claim for any additional liability according to the provisions of this Condition 3. Loss Settlement, provided you notify us of your intent to do so within 180 days after the date of loss.

4. **Loss Deductible.** Unless otherwise stated in this policy, the following deductible provision applies:

Subject to the policy limits that apply, we will pay only that part of the total of all loss payable under Section I that exceeds the deductible amount shown in the Declarations.

5. **Loss to a Pair or Set.** In case of loss to a pair or set we may elect to:

   a. Repair or replace any part to restore the pair or set to its value before the loss; or

   b. Pay the difference between actual cash value of the property before and after the loss.

6. **Loss Payment.** We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment. Loss will be payable 60 days after we receive your proof of loss and:

   a. Reach an agreement with you;

   b. There is an entry of a final judgment; or

   c. There is a filing of an appraisal award with us.

7. **Appraisal.** If you and we fail to agree on the amount of loss, either may demand an appraisal of the loss. In this event, each party will choose a competent and impartial appraiser within 20 days after receiving a written request from the other. The two appraisers will choose an umpire. If they cannot agree upon an umpire within 15 days, you or we may request that the choice be made by a judge of a court of record in the state where the "residence premises" is located. The appraisers will separately set the amount of loss. If the appraisers submit a written report of an agreement to us, the amount agreed upon will be the amount of loss. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of loss.

Each party will:

   a. Pay its own appraiser; and

   b. Bear the other expenses of the appraisal and umpire equally.

8. **Other Insurance and Service Agreement.** If a loss covered by this policy is also covered by:

   a. Other insurance, we will pay only the proportion of the loss that the limit of liability that

applies under this policy bears to the total amount of insurance covering the loss; or

   b. A service agreement, the coverage provided under this policy is excess over any amounts payable under any such agreement. Service agreement means a service plan, property restoration plan, home warranty or other similar service warranty agreement, even if it is characterized as insurance.

9. **Suit Against Us.** No action can be brought against us unless there has been full compliance with all of the terms under Section I of this policy and the action is started within two years after the date of loss.

10. **Our Option.** If we give you written notice within 30 days after we receive your signed, sworn proof of loss, we may repair or replace any part of the damaged property with material or property of like kind and quality.

11. **Abandonment of Property.** We need not accept any property abandoned by an "insured".

12. **Mortgage Clause.**

   a. If a mortgagee is named in this policy, any loss payable under Coverage A or B will be paid to the mortgagee and you, as interests appear. If more than one mortgagee is named, the order of payment will be the same as the order of precedence of the mortgages.

   b. If we deny your claim, that denial will not apply to a valid claim of the mortgagee, if the mortgagee:

      (1) Notifies us of any change in ownership, occupancy or substantial change in risk of which the mortgagee is aware;

      (2) Pays any premium due under this policy on demand if you have neglected to pay the premium; and

      (3) Submits a signed, sworn statement of loss within 60 days after receiving notice from us of your failure to do so. Policy conditions relating to Appraisal, Suit Against Us and Loss Payment apply to the mortgagee.

   c. If we decide to cancel or not to renew this policy, the mortgagee will be notified at least 10 days before the date cancellation or nonrenewal takes effect.

   d. If we pay the mortgagee for any loss and deny payment to you:

(1) We are subrogated to all the rights of the mortgagee granted under the mortgage on the property; or

(2) At our option, we may pay to the mortgagee the whole principal on the mortgage plus any accrued interest. In this event, we will receive a full assignment and transfer of the mortgage and all securities held as collateral to the mortgage debt.

e. Subrogation will not impair the right of the mortgagee to recover the full amount of the mortgagee's claim.

13. **No Benefit to Bailee.** We will not recognize any assignment or grant any coverage that benefits a person or organization holding, storing or moving property for a fee regardless of any other provision of this policy.

14. **Nuclear Hazard Clause.**

a. "Nuclear Hazard" means any nuclear reaction, radiation, or radioactive contamination, all whether controlled or uncontrolled or however caused, or any consequence of any of these.

b. Loss caused by the nuclear hazard will not be considered loss caused by fire, explosion, or smoke, whether these perils are specifically named in or otherwise included within the Perils Insured Against.

c. This policy does not apply under Section I to loss caused directly or indirectly by nuclear hazard, except that direct loss by fire resulting from the nuclear hazard is covered.

15. **Recovered Property.** If you or we recover any property for which we have made payment under this policy, you or we will notify the other of the recovery. At your option, the property will be returned to or retained by you or it will become our property. If the recovered property is returned to or retained by you, the loss payment will be adjusted based on the amount you received for the recovered property.

16. **Volcanic Eruption Period.** One or more volcanic eruptions that occur within a 72-hour period will be considered as one volcanic eruption.

17. **Policy Period.** This policy applies only to loss which occurs during the policy period.

18. **Concealment or Fraud.** We provide coverage to no "insureds" under this policy if, whether before or after a loss, an "insured" has:

a. Intentionally concealed or misrepresented any material fact or circumstance;

b. Engaged in fraudulent conduct; or

c. Made false statements;

relating to this insurance.

19. **Premises Alarm or Fire Protection System.** (Applies only if PROTECTIVE DEVICES CREDIT is shown in the Declarations.)

We acknowledge the installation of an alarm system and/or an automatic sprinkler system approved by us on the "residence premises". You agree to maintain this system or systems in working order and to let us know promptly of any change, including removal, made to the system(s).

---

## SECTION II - LIABILITY COVERAGES

### COVERAGE E - PERSONAL LIABILITY

If a claim is made or a suit is brought against an "insured" for damages because of "bodily injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

1. Pay up to our limit of liability for the damages for which an "insured" is legally liable. Damages include prejudgment interest awarded against an "insured"; and

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when our limit of lia-

ability for the "occurrence" is exhausted by the payment of a judgment or settlement.

### COVERAGE F - MEDICAL PAYMENTS TO OTHERS

We will pay the necessary medical expenses that are incurred or medically ascertained within three years from the date of an accident causing "bodily injury". Medical expenses means reasonable charges for medical, surgical, x-ray, dental, ambulance, hospital, professional nursing, prosthetic devices and funeral services. This coverage does not apply to you or regular residents of your household except "residence employees". As to others, this coverage applies only:

1. To a person on the "insured location" with the permission of an "insured"; or

2.  To a person off the "insured location", if the "bodily injury";

    a.  Arises out of a condition on the "insured location" or the ways immediately adjoining;

    b.  Is caused by the activities of an "insured";

c.  Is caused by a "residence employee" in the course of the "residence employee's" employment by an "insured"; or

d.  Is caused by an animal owned by or in the care of an "insured".

---

## SECTION II - ADDITIONAL COVERAGES

We cover the following in addition to the limits of liability:

1.  **Claim Expenses.** We pay:

    a.  Expenses we incur and costs taxed against an "insured" in any suit we defend;

    b.  Premiums on bonds required in a suit we defend, but not for bond amounts more than the Coverage E limit of liability. We need not apply for or furnish any bond;

    c.  Reasonable expenses incurred by an "insured" at our request, including actual loss of earnings (but not loss of other income) up to $250 per day, for assisting us in the investigation or defense of a claim or suit; and

    d.  Interest on the entire judgment which accrues after entry of the judgment and before we pay or tender, or deposit in court that part of the judgment which does not exceed the limit of liability that applies.

2.  **First Aid Expenses.** We will pay expenses for first aid to others incurred by an "insured" for "bodily injury" covered under this policy. We will not pay for first aid to an "insured".

3.  **Damage to Property of Others.** We will pay, at replacement cost, up to $1,000 per "occurrence" for "property damage" to property of others caused by an "insured".

    We will not pay for "property damage":

    a.  To the extent of any amount recoverable under Section I;

    b.  Caused intentionally by an "insured" who is 13 years of age or older;

    c.  To property owned by an "insured";

    d.  To property owned by or rented to a tenant of an "insured" or a resident in your household; or

    e.  Arising out of:

        (1)  A "business" engaged in by an "insured";

        (2)  Any act or omission in connection with a premises owned, rented or controlled by an "insured", other than the "insured location"; or

        (3)  The ownership, maintenance, occupancy, operation, use, loading or unloading of aircraft, hovercraft, watercraft or "motor vehicles".

             This exclusion **e.(3)** does not apply to a "motor vehicle" that:

             (a)  Is designed for recreational use off public roads;

             (b)  Is not owned by an "insured"; and

             (c)  At the time and place of an "occurrence", is not required by law, or regulation issued by a government agency, to have been registered for it to be used at the place of the "occurrence".

4.  **Loss Assessment.** We will pay up to $1,000 for your share of loss assessment charged against you, as owner or tenant of the "residence premises", during the policy period by a corporation or association of property owners, when the assessment is made as a result of:

    a.  "Bodily injury" or "property damage" not excluded under Section II of this policy; or

    b.  Liability for an act of a director, officer or trustee in the capacity as a director, officer or trustee, provided such person:

        (1)  Is elected by the members of a corporation or association of property owners; and

        (2)  Serves without deriving any income from the exercise of duties which are solely on behalf of a corporation or association of property owners.

    Section II Condition **9.** Policy Period, does not apply to this coverage.

Regardless of the number of assessments, the limit of $1,000 is the most we will pay for loss arising out of:

a. One accident, including continuous or repeated exposure to substantially the same general harmful condition; or

b. A covered act of a director, officer or trustee. An act involving more than one director, officer or trustee is considered to be a single act.

We do not cover assessments charged against you or a corporation or association of property owners by any governmental body.

---

## SECTION II - EXCLUSIONS

### A. Coverage E - Personal Liability and Coverage F - Medical Payments to Others.

Coverages E and F do not apply to "bodily injury" or "property damage":

1. Which is expected or intended by an "insured" even if the resulting "bodily injury" or "property damage":

   a. Is of a different kind, quality or degree than initially expected or intended; or

   b. Is sustained by a different person, entity, real or personal property, than initially expected or intended.

   However, this exclusion A.1. does not apply to "bodily injury" resulting from the use of reasonable force by an "insured" to protect persons or property.

2. Arising out of or in connection with a "business" conducted from an "insured location" or engaged in by an "insured", whether or not the "business" is owned or operated by an "insured" or employs an "insured". This exclusion A.2. applies to, but is not limited to, an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business".

   This exclusion A.2. does not apply to:

   a. The rental or holding for rental of an "insured location";

      (1) On an occasional basis if used only as a residence;

      (2) In part for use only as a residence, unless a single family unit is intended for use by the occupying family to lodge more than two roomers or boarders;

      (3) In part, as an office, school, studio or private garage;

      (4) Shown in the Declarations as an ADDITIONAL RESIDENCE RENTED TO OTHERS; or

      (5) Shown in the Declarations as a STRUCTURE RENTED TO OTHERS.

   b. An "insured" under the age of 21 years involved in a part-time or occasional, self-employed "business" with no employees; or

   c. One or more activities, for which no "insured" receives more than $2,000 in total compensation for the consecutive 12 months before an "occurrence";

3. Arising out of the rendering of or failure to render professional services;

4. Arising out of a premises:

   a. Owned by an "insured";

   b. Rented to an "insured"; or

   c. Rented to others by an "insured";

   that is not an "insured location";

5. Caused directly or indirectly by war, including the following and any consequence of any of the following:

   a. Undeclared war, civil war, insurrection, rebellion or revolution;

   b. Warlike act by a military force or military personnel; or

   c. Destruction, seizure or use for a military purpose.

   Discharge of a nuclear weapon will be deemed a warlike act even if accidental;

6. Arising out of the transmission of a communicable disease by an "insured";

7. Arising out of sexual molestation, corporal punishment or physical or mental abuse;

8. Arising out of the use, sale, manufacture, delivery, transfer or possession by any person of a Controlled Substance(s) as defined by the Federal Food and Drug Law at 21 U.S.C.A. Sections 811 and 812. Controlled Substances include but are not limited to cocaine, LSD, marijuana and all narcotic drugs. However, this exclusion does not apply to the legitimate use of prescription drugs

by a person following the orders of a licensed physician;

9. Arising out of, consisting of, caused by, contributed to, aggravated by or resulting from, whether directly or indirectly, by "fungi", other microbes or rot. This includes:

   a. The cost of testing, monitoring, abating, mitigating, removing, remediating or disposing of "fungi", other microbes or rot;

   b. Any supervision, instruction, disclosures, or failures to disclose, recommendations, warnings, or advice given, or that allegedly should have been given, in connection with "bodily injury" or "property damage" consisting of, arising out of, caused by, contributed to, aggravated by or resulting from, whether directly or indirectly, by "fungi", other microbes or rot, or the activities described in 9.a. above;

   c. Any obligation to share with or repay another who must pay damages because of "bodily injury" or "property damage" damage of the type described in this exclusion. This applies regardless of any other cause that contributed directly or indirectly, concurrently or in any sequence to the "bodily injury" or "property damage"; and

   d. Liability imposed upon any "insured" by any governmental authority for "bodily injury" or "property damage" consisting of, arising out of, caused by, contributed to, aggravated by or resulting from, whether directly or indirectly, by "fungi", other microbes or rot; or

10. Arising out of, resulting from, caused by or contributed to by the escape or release of fuel from a "fuel system". This exclusion applies, but is not limited to:

   a. Any supervision, instructions, recommendations, warnings or advice given in connection with the above;

   b. Any obligation to share damages, losses, costs, payments or expenses with or repay someone else who must make payment because of such "bodily injury" or "property damage", damages, loss, cost, payment or expense; or

   c. Any request, order or requirement to test for, monitor, abate, mitigate, remediate, contain, remove, dispose of, or in any way respond to or assess the effects of fuel in any form.

   However, this exclusion does not apply to "bodily injury" or "property damage" arising out of fire or explosion that results from such escaped or released fuel.

11. Any loss, cost, payment or expense, including, but not limited to, defense and investigation, of any kind arising out of, resulting from, caused by or contributed to by the actual or alleged presence or actual, alleged or threatened dispersal, release, ingestion, inhalation or absorption of lead, lead pigment, lead compounds or lead in any form which is or was contained or incorporated into any material or substance. This exclusion applies, but is not limited to:

   a. Any supervision, instructions, recommendations, warnings or advice given in connection with the above;

   b. Any obligation to share damages, losses, costs, payments or expenses with or repay someone else who must make payment because of such "bodily injury" or "property damage", damages, loss, cost, payment or expense; or

   c. Any request, order or requirement to test for, monitor, abate, mitigate, remediate, contain, remove, dispose of, or in any way respond to or assess the effects of lead, lead pigment, lead compounds or materials or substances containing lead in any form.

B. **Coverage E- Personal Liability and Coverage F- Medical Payments to Others.**

Coverages E and F also do not apply to:

1. "Motor Vehicle Liability" unless, at the time of an "occurrence", the involved "motor vehicle" is:

   a. In dead storage on an "insured location";

   b. Used to service an "insured's" residence;

   c. Designed to assist the handicapped and, at the time of an "occurrence", it is:

      (1) Being used to assist a handicapped person; or

      (2) Parked on an "insured location";

   d. Designed for recreational use off public roads and:

      (1) Not owned by an "insured"; or

      (2) Owned by an "insured", provided the "occurrence" takes place on an "insured location" as defined in Definitions paragraphs 8.a., b., d., e. or h.; or

   e. A motorized golf cart that is owned by an "insured", designed to carry up to 4 persons, not built or modified after manufacture to exceed a speed of 25 miles per hour on level ground and, at the time of an "occurrence", is within the legal boundaries of:

(1) A golfing facility and is parked or stored there, or being used by an "insured" to:

    (a) Play the game of golf or for other recreational or leisure activity allowed by the facility;

    (b) Travel to or from an area where "motor vehicles" or golf carts are parked or stored; or

    (c) Cross public roads at designated points to access other parts of the golfing facility; or

(2) A private residential community, including its public roads upon which a motorized golf cart can legally travel, which is subject to the authority of a property owners association and contains an "insured's" residence.

However this exception to the exclusion from coverage does not apply if, at the time and place of an "occurrence", the involved "motor vehicle":

a. Is registered for use on public roads or property;

b. Is not registered for use on public roads or property, but such registration is required by a law, or regulation issued by a government agency, for it to be lawfully used at the place of the "occurrence"; or

c. Is being:

    (1) Operated in, or practicing for, any prearranged or organized race, speed contest or other competition;

    (2) Rented to others;

    (3) Used to carry persons or cargo for a charge; or

    (4) Used for any other "business" purpose except for a motorized golf cart used for incidental "business" entertainment while on a golfing facility.

2. "Watercraft liability" unless, at the time of an "occurrence", the involved watercraft:

a. Is stored;

b. Is a sailing vessel, with or without auxiliary power that is:

    (1) Less than 26 feet in overall length; or

    (2) 26 feet or more in overall length and not owned by or rented to an "insured";

c. Is not a sailing vessel and is powered by:

(1) An inboard or inboard-outdrive engine or motor, including those that power a water jet pump, of:

    (a) 50 horsepower or less and not owned by an "insured"; or

    (b) More than 50 horsepower and not owned by or rented to an "insured"; or

(2) One or more outboard engines or motors with:

    (a) 25 total horsepower or less; or

    (b) More than 25 horsepower if the outboard engine or motor is not owned by an "insured";

    (c) More than 25 horsepower if the outboard engine or motor is owned by an "insured" who acquired it during the policy period, or:

    (d) More than 25 horsepower if the outboard engine or motor is owned by an "insured" who acquired it before the policy period, but only if:

        (1) You declare them at policy inception; or

        (2) Your intent to insure them is reported to us in writing within 45 days after you acquire them.

The coverages in (c) and (d) above apply for the policy period.

Horsepower means the maximum power rating assigned to the engine or motor by the manufacturer.

However this exception to the exclusion from coverage does not apply if, at the time and place of an "occurrence", the involved watercraft is being:

a. Operated in, or practicing for, any prearranged or organized race, speed contest or other competition. This exclusion does not apply to a sailing vessel or a predicted log cruise;

b. Rented to others;

c. Used to carry persons or cargo for a charge; or

d. Used for any other "business" purpose.

3. "Aircraft Liability".

4. "Hovercraft Liability".

Exclusions A.4., B.1., B.2., B.3. and B.4. do not apply to "bodily injury" to a "residence employee" arising out

of and in the course of the "residence employee's" employment by an "insured".

## C. Coverage E - Personal Liability.

Coverage E does not apply to:

1. Liability:

   a. For any loss assessment charged against you as a member of an association, corporation or community of property owners, except as provided in Additional Coverage 4. Loss Assessment;

   b. Under any contract or agreement entered into by an "insured". However, this exclusion does not apply to written contracts:

      (1) That directly relate to the ownership, maintenance or use of an "insured location"; or

      (2) In which the liability of others is assumed by the "insured" prior to an "occurrence";

      unless excluded in a. above or elsewhere in this policy;

2. "Property damage" to property owned by the "insured". This includes costs or expenses incurred by an "insured" or others to repair, replace, enhance, restore or maintain such property to prevent injury to a person or damage to property of others, whether on or away from an "insured location".

3. "Property damage" to property rented to, occupied or used by or in the care of the "insured." This exclusion does not apply to "property damage" caused by fire, smoke or explosion;

4. "Bodily injury" to any person eligible to receive any benefits voluntarily provided or required to be provided by an "insured" under any:

   a. Workers' compensation law;

   b. Non-occupational disability law; or

   c. Occupational disease law;

5. "Bodily injury" or "property damage" for which an "insured" under this policy:

   a. Is also an insured under a nuclear energy liability policy issued by the:

      (1) Nuclear Energy Liability Insurance Association;

      (2) Mutual Atomic Energy Liability Underwriters;

      (3) Nuclear Insurance Association of Canada;

      or any of their successors; or

   b. Would be an insured under that policy but for the exhaustion of its limit of liability;

6. "Bodily injury" to you or an "insured" as defined in Definition 7.a. or b.

   This exclusion also applies to any claim made or suit brought against you or an "insured":

   a. To repay; or

   b. Share damages with;

   another person who may be obligated to pay damages because of "bodily injury" to an "insured"; or

7. "Bodily injury" to an "employee", "residence employee" or a temporary employee furnished to the "insured" to substitute for a permanent "residence employee" arising out of or in the course of the employee's employment by any Additional Insured named in the Declarations.

## D. Coverage F - Medical Payments to Others.

Coverage F does not apply to "bodily injury":

1. To a "residence employee" if the "bodily injury":

   a. Occurs off the "insured location"; and

   b. Does not arise out of or in the course of the "residence employee's" employment by an "insured";

2. To any person eligible to receive benefits voluntarily provided or required to be provided under any:

   a. Workers' compensation law;

   b. Non-occupational disability law; or

   c. Occupational disease law;

3. From any:

   a. Nuclear reaction;

   b. Nuclear radiation; or

   c. Radioactive contamination;

   all whether controlled or uncontrolled or however caused; or

   d. Any consequence of any of these; or

4. To any person, other than a "residence employee" of an "insured", regularly residing on any part of the "insured location".

## SECTION II - CONDITIONS

1. **Limit of Liability.** Our total liability under Coverage E for all damages resulting from any one "occurrence" will not be more than the Coverage E limit of liability shown in the Declarations. This limit is the same regardless of the number of "insureds", claims made or persons injured. All "bodily injury" and "property damage" resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one "occurrence".

   Our total liability under Coverage F for all medical expense payable for "bodily injury" to one person as the result of one accident will not be more than the Coverage F limit of liability shown in the Declarations.

2. **Severability of Insurance.** This insurance applies separately to each "insured". This condition will not increase our limit of liability for any one "occurrence".

3. **Duties After "Occurrence".** In case of an "occurrence", you or another "insured" will perform the following duties that apply. We have no duty to provide coverage under this policy if your failure to comply with the following duties is prejudicial to us. You will help us by seeing that these duties are performed:

   a. Give us written notice as soon as is practical, which sets forth:

      (1) The identity of the policy and the named "insured" shown in the Declarations;

      (2) Reasonably available information on the time, place and circumstances of the "occurrence"; and

      (3) Names and addresses of any claimants and witnesses;

   b. Cooperate with us in the investigation, settlement or defense of any claim or suit;

   c. Promptly forward to us every notice, demand, summons or other process relating to the "occurrence";

   d. At our request, help us:

      (1) To make settlement;

      (2) To enforce any right of contribution or indemnity against any person or organization who may be liable to an "insured";

      (3) With the conduct of suits and attend hearings and trials; and

      (4) To secure and give evidence and obtain the attendance of witnesses;

   e. With respect to Additional Coverage 3. Damage to Property of Others, submit to us within 60 days after the loss, a sworn statement of loss and show the damaged property, if in an "insured's" control;

   f. No "insured" shall, except at such "insured's" own cost, voluntarily make payment, assume obligation or incur expense other than for first aid to others at the time of the "bodily injury".

4. **Duties of an Injured Person - Coverage F - Medical Payments to Others.**

   a. The injured person or someone acting for the injured person will:

      (1) Give us written proof of claim, under oath if required, as soon as is practical; and

      (2) Authorize us to obtain copies of medical reports and records.

   b. The injured person will submit to a physical exam by a doctor of our choice when and as often as we reasonably require.

5. **Payment of Claim - Coverage F - Medical Payments to Others.** Payment under this coverage is not an admission of liability by an "insured" or us.

6. **Suit Against Us.** No action can be brought against us unless there has been full compliance with all of the terms under this Section II.

   No one will have the right to join us as a party to any action against an "insured". Also, no action with respect to Coverage E can be brought against us until the obligation of such "insured" has been determined by final judgment or agreement signed by us.

7. **Bankruptcy of an Insured.** Bankruptcy or insolvency of an "insured" will not relieve us of our obligations under this policy.

8. **Other Insurance.** This insurance is excess over other valid and collectible insurance except insurance written specifically to cover as excess over the limits of liability that apply in this policy.

9. **Policy Period.** This policy applies only to "bodily injury" or "property damage" which occurs during the policy period.

**10. Concealment or Fraud.** We do not provide coverage to an "insured" who, whether before or after a loss, has:

a. Intentionally concealed or misrepresented any material fact or circumstance;

b. Engaged in fraudulent conduct; or

c. Made false statements;

relating to this insurance.

---

## SECTIONS I AND II - CONDITIONS

**1. Liberalization Clause.** If we make a change which broadens coverage under this edition of our policy without additional premium charge, that change will automatically apply to your insurance as of the date we implement the change in your state, provided that this implementation date falls within 60 days prior to or during the policy period stated in the Declarations.

This Liberalization Clause does not apply to changes implemented with a general program revision that includes both broadenings and restrictions of coverage, whether that general program revision is implemented through introduction of:

a. A subsequent edition of this policy form; or

b. An amendatory endorsement

**2. Waiver or Change of Policy Provisions.** A waiver or change of a provision of this policy must be in writing by us to be valid. Our request for an appraisal or examination will not waive any of our rights.

The coverage provided and the premium charged are based on information you have given us. You agree to cooperate with us in determining if this information is correct and complete and to inform us of any change in title, use or occupancy of the "residence premises".

You agree that, if within 60 days of the policy effective date this information changes, is incorrect or incomplete, we may adjust your coverage and premium accordingly by giving you notice. This notice may be delivered to you, or mailed to you at your mailing address shown in the Declarations. The notice will contain the changed, incorrect or incomplete information along with the resulting premium change.

**3. Cancellation.**

a. You may cancel this policy at any time by returning it to us or by letting us know in writing of the date cancellation is to take effect.

b. We may cancel this policy only for the reasons stated below by letting you know in writing of the date cancellation takes effect. This cancellation notice may be delivered to you, or mailed to you at your mailing address

shown in the Declarations. Proof of mailing will be sufficient proof of notice.

(1) When you have not paid the premium, we may cancel at any time by letting you know at least 10 days before the date cancellation takes effect.

(2) When this policy has been in effect for less than 60 days and is not a renewal with us, we may cancel for any reason by letting you know at least 10 days before the date cancellation takes effect.

(3) When this policy has been in effect for 60 days or more, or at any time if it is a renewal with us, we may cancel:

(a) If there has been a material misrepresentation of fact which if known to us would have caused us not to issue the policy; or

(b) If the risk has changed substantially since the policy was issued.

This can be done by letting you know at least 30 days before the date cancellation takes effect.

c. We will also mail a copy of any notice of cancellation to any Additional Insured named in the Declarations.

d. When this policy is cancelled, the premium for the period from the date of cancellation to the expiration date will be refunded pro rata.

e. If the return premium is not refunded with the notice of cancellation or when this policy is returned to us, we will refund it within a reasonable time after the date cancellation takes effect.

**4. Nonrenewal.** We may elect not to renew this policy. We may do so by delivering to you, or mailing to you at your mailing address shown in the Declarations, written notice at least 30 days before the expiration date of this policy. Proof of mailing will be sufficient proof of notice. We will also mail a copy of the notice to any Additional Insured named in the Declarations.

If we offer to renew and you or your representative do not accept, this policy will automatically terminate without notice of termination at the end of the current policy period. Failure to pay the required renewal premium when due shall mean that you have not accepted our offer.

5. **Assignment.** Assignment of this policy will not be valid unless we give our written consent.

6. **Subrogation.** An "insured" may waive in writing before a loss all rights of recovery against any person. If not waived, we may require an assignment of rights of recovery for a loss to the extent that payment is made by us.

If an assignment is sought, an "insured" must sign and deliver all related papers and cooperate with us.

Subrogation does not apply under Section II to Medical Payments to Others or Damage to Property of Others.

7. **Death.** If any person named in the Declarations or the spouse, if a resident of the same household, dies:

   a. We insure the legal representative of the deceased but only with respect to the premises and property of the deceased covered under the policy at the time of death;

   b. "Insured" includes:

     (1) An "insured" who is a member of your household at the time of your death, but only while a resident of the "residence premises"; and

     (2) With respect to your property, the person having proper temporary custody of the property until appointment and qualification of a legal representative.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SPECIAL PERSONAL PROPERTY COVERAGE
### Form HO-3 Only

### SECTION I – PROPERTY COVERAGES
### COVERAGE C – PERSONAL PROPERTY

**Special Limits of Liability** Items e., f., and g., are deleted and replaced by the following:

**e.** $1,500 for loss by theft, misplacing or losing of jewelry, watches, furs, precious and semiprecious stones.

**f.** $2,500 for loss by theft, misplacing or losing of firearms and related equipment.

**g.** $2,500 for loss by theft, misplacing or losing of silverware, silver-plated ware, goldware, gold-plated ware, platinumware, platinum-plated ware and pewterware. This includes flatware, hollow-ware, tea sets, trays and trophies made of or including silver, gold, platinum or pewter.

### SECTION I – PERILS INSURED AGAINST

The Perils Insured Against under Coverages A, B and C are deleted and replaced by the following:

We insure against risk of direct physical loss to property described in Coverages A, B and C.

We do not insure, however, for loss:

1. Under Coverages A, B and C:

   **a.** Excluded under SECTION I – EXCLUSIONS;

   **b.** Involving collapse or danger of collapse, except as provided in Additional Coverage 9. Collapse under Section I – Property Coverages; or

   **c.** Caused by:

      **(1)** Freezing of a plumbing, heating, air conditioning or automatic fire protective sprinkler system or of a household appliance, or by discharge, leakage or overflow from within the system or appliance caused by freezing. This exclusion does not apply if you have used reasonable care to:

         **(a)** Maintain heat in the building; or

         **(b)** Shut off the water supply and drain the system and appliances of water;

      However, if the building is protected by an automatic fire protective sprinkler system, you must use reasonable care to continue the water supply and maintain heat in the building for coverage to apply.

For purposes of this provision a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, downspout or similar fixtures or equipment;

   **(2)** Freezing, thawing, pressure or weight of water or ice, whether driven by wind or not, to a:

      **(a)** Fence, pavement, patio or swimming pool;

      **(b)** Footing, foundation, bulkhead, wall, or any other structure or device that supports all or part of a building, or other structure;

      **(c)** Retaining wall or bulkhead that does not support all or part of a building or other structure; or

      **(d)** Pier, wharf or dock;

   **(3)** Theft in or to a dwelling under construction, or of materials and supplies for use in the construction until the dwelling is finished and occupied;

   **(4)** Constant or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more; or

   **(5)** Any of the following:

      **(a)** Wear and tear, marring, deterioration;

      **(b)** Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

      **(c)** Smog, rust or other corrosion;

      **(d)** Smoke from agricultural smudging or industrial operations;

      **(e)** Discharge, dispersal, seepage, migration, release or escape of pollutants unless the discharge, dispersal, seepage, migration, release or escape is itself caused by a Peril Insured Against.

      Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals

and waste. Waste includes materials to be recycled, reconditioned or reclaimed;

**(f)** Settling, shrinking, bulging or expansion, including resultant cracking, of pavements, patios, foundations, walls, floors, roofs or ceilings;

**(g)** Birds, vermin, rodents, or insects; or

**(h)** Animals owned or kept by an "insured".

**Exception To c.(5)**

Unless the loss is otherwise excluded, we cover loss to property covered under Coverage A, B or C resulting from an accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance on the "residence premises". This includes the cost to tear out and replace any part of a building, or other structure, on the "residence premises", but only when necessary to repair the system or appliance. However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to a building on the "residence premises".

We do not cover loss to the system or appliance from which this water or steam escaped.

For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, down spout or similar fixtures or equipment.

Under items **1. b. and c.**, any ensuing loss to property described in Coverages A, B and C not excluded by any other provision in this policy is covered.

**2.** Under Coverages A and B:

Caused by vandalism or malicious mischief, and any ensuing loss caused by any intentional and wrongful act committed in the course of the vandalism or malicious mischief, if the building containing the "residence premises" has been vacant for more than 60 consecutive days immediately before the loss. Vacant means substantially empty of personal property necessary to sustain normal occupancy. A dwelling being constructed is not considered vacant.

**3.** Under Coverage C caused by:

**a.** Breakage of:

**(1)** Eyeglasses, glassware, statuary, marble;

**(2)** Bric-a-brac, porcelains and similar fragile articles other than jewelry, watches, bronzes, cameras and photographic lenses.

There is coverage for breakage of the property by or resulting from:

**(1)** Fire, lightning;

**(2)** Windstorm, hail;

**(3)** Smoke, other than smoke from agricultural smudging or industrial operations;

**(4)** Explosion, volcanic eruption;

**(5)** Riot, civil commotion;

**(6)** Aircraft, vehicles;

**(7)** Vandalism and malicious mischief;

**(8)** Collapse of a building or any part of a building;

**(9)** Water not otherwise excluded;

**(10)** Theft or attempted theft; or

**(11)** Sudden and accidental tearing apart, cracking, burning or bulging of:

**(a)** A steam or hot water heating system;

**(b)** An air conditioning or automatic fire protective sprinkler system; or

**(c)** An appliance for heating water;

**b.** Dampness of atmosphere or extremes of temperature unless the direct cause of loss is rain, snow, sleet or hail;

**c.** Refinishing, renovating or repairing property other than watches, jewelry and furs;

**d.** Collision, other than collision with a land vehicle, sinking, swamping or stranding of watercraft, including their trailers, furnishings, equipment and outboard engines or motors;

**e.** Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body. However, any ensuing loss to property described in Coverage C not excluded or excepted in this policy is covered; or

**f.** Error in computer programming or instructions to any computer.

**SECTION I – EXCLUSIONS**

**A.3. Water Damage.** The following paragraphs are added:

Water damage to property described in Coverage C away from a premises or location owned, rented, occupied or controlled by an "insured" is covered.

Water damage to property described in Coverage C on a premises or location owned, rented, occupied or controlled by an "insured" is excluded even if weather conditions contribute in any way to produce the loss.

Paragraph B. is deleted and replaced by the following:

B. We do not insure for loss caused by any of the following. However, any ensuing loss not excluded by any other provision in this policy is covered.

1. Weather conditions. However, this exclusion applies only if weather conditions contribute in any way with a cause or event excluded in A. above to produce the loss.

2. Acts or decisions, including the failure to act or decide, of any person, group, organization or governmental body.

3. Faulty, inadequate or defective:

   a. Planning, zoning, development, surveying, siting;

   b. Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

   c. Materials used in repair, construction, renovation or remodeling; or

   d. Maintenance;

   of part or all of any property whether on or off the "residence premises".

All other provisions of this policy apply.

HO-85 (12-08)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ENHANCED HOME PACKAGE
### FORMS HO-2 AND HO-3 ONLY

**DEFINITIONS**

Under **10.** "Occurrence," the following sentence is added:

"Occurrence" also means an offense, including a series of related offenses, committed during the policy period that results in "personal injury".

The following is added:

**14.** "Personal injury" means injury, other than "bodily injury", caused by any of the following offenses committed during the policy period:

   **a.** False arrest, detention or imprisonment;

   **b.** Malicious prosecution;

   **c.** The wrongful eviction from, wrongful entry into, or invasion of the right of private occupancy of a room, dwelling or premises that a person occupies, committed by or on behalf of its owner, landlord or lessor;

   **d.** Oral, written or electronic publication of material that slanders or libels a person or organization or disparages a person's or organization's goods, products or services; or

   **e.** Oral, written or electronic publication of material that violates a person's right of privacy.

**SECTION I – PROPERTY COVERAGES**

**COVERAGE C - PERSONAL PROPERTY**

The Coverage C limit shown on the Declarations is increased to 70% of the limit shown for COVERAGE A - DWELLING.

**Special Limits of Liability**

The special limits shown in the policy for each category are increased as follows:

   **a.** $100 additional on money, bank notes, bullion, gold other than goldware, silver other than silverware, platinum other than platinumware, coins, medals, scrip, stored value cards and smart cards.

   **b.** $1,500 additional on securities, accounts, deeds, evidence of debt, letters of credit, notes other than bank notes, manuscripts, personal records, passports, tickets and stamps. This dollar limit applies to these categories regardless of the medium (such as paper or computer software) on which the material exists.

This limit includes the cost to research, replace or restore the information from the lost or damaged material.

   **c.** $1,500 additional on watercraft of all types, including their trailers, furnishings, equipment and outboard engines or motors.

   **d.** $1,500 additional on trailers or semi-trailers not used with watercraft of all types.

   **e.** $1,500 for loss by theft of jewelry, watches, furs, precious and semiprecious stones.

   **f.** $1,000 for loss by theft of firearms and related equipment.

   **g.** $1,500 for loss by theft of silverware, silver-plated ware, goldware, gold-plated ware, platinumware, platinum-plated ware and pewterware. This includes flatware, hollowware, tea sets, trays and trophies made of or including silver, gold, platinum or pewter.

   **h.** $500 additional on property, on the "residence premises", used primarily for "business" purposes.

   **i.** $250 additional on property, away from the "residence premises", used primarily for "business" purposes. However, this limit does not apply to loss to electronic apparatus and accessories described in category **j.** below.

   **j.** $500 additional on electronic apparatus and accessories, while in or upon a "motor vehicle", but only if the apparatus is equipped to be operated by power from the "motor vehicle's" electrical system while still capable of being operated by other power sources.

   **k.** $250 additional on tapes, records, discs or other media that can be used with any electronic apparatus, while in or upon a "motor vehicle".

**SECTION I - ADDITIONAL COVERAGES**

The following Additional Coverages are added:

**Lock Replacement Coverage.** We will pay you an amount not to exceed $250 that you incur in changing the locks on your "residence premises" when your keys have been stolen. The theft of keys must be reported to the police for this additional coverage to apply.

No deductible applies to this additional coverage.

HO-85 (12-08)

Page 1 of 5

**Reward Coverage.** We will pay you an amount, not to exceed $250, that you have incurred in the payment of rewards for information leading to the return of stolen articles or the arrest and conviction of any person(s) who have stolen articles and/or damaged any of your covered property.

## Water Back Up And Sump Discharge Or Overflow

### A. Coverage

We insure, up to the limit of liability shown in the Declarations for this coverage, for direct physical loss, not caused by the negligence of an "insured", to property covered under Section I caused by water, or water-borne material, which:

1. Backs up through sewers or drains; or

2. Overflows or is discharged from a:

    a. Sump, sump pump; or

    b. Related equipment;

    even if such overflow or discharge results from mechanical breakdown. This coverage does not apply to direct physical loss of the sump pump, or related equipment, which is caused by mechanical breakdown.

This coverage does not increase the limits of liability for Coverages A, B, C, or D stated in the Declarations.

### B. Section I - Perils Insured Against

With respect to the coverage described in **A.** above, in Form **HO-3** paragraph **2.c.(6)(b)** under Coverage A – Dwelling And Coverage B – Other Structures, and in Form **HO-15** paragraph **1.c.(5)(b)** are deleted and replaced by the following;

Latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself;

### C. Section I - Exclusions

3. **Water Damage.** Paragraph **b.** is deleted and replaced by the following:

    b. Water, or water-borne material, which:

        (1) Backs up through sewers or drains; or

        (2) Overflows or is discharged from; a sump, sump pump or related equipment;

        as a direct or indirect result of flood; or

The following Additional Coverages are changed as follows:

5. **Fire Department Service Charge.**

We agree to increase the limit of liability that applies to this additional coverage by the amount of $250.

7. **Credit Card, Fund Transfer Card, Forgery and Counterfeit Money.**

We agree to increase the limit of liability that applies to this additional coverage by the amount of $1,500.

8. **Loss Assessment.**

We agree to increase the limit of liability that applies to this additional coverage by the amount of $4,000.

## SECTION I - CONDITIONS

3. **Loss Settlement** is deleted and replaced by the following:

3. **Loss Settlement.** In this Condition **3.**, the terms "cost to repair or replace" and "replacement cost" do not include the increased costs incurred to comply with the enforcement of any ordinance or law, except to the extent that coverage for these increased costs is provided in Additional Coverage **12.** Ordinance Or Law. Covered property losses are settled as follows:

    a. Property of the following type are settled at replacement cost at the time of loss:

        (1) Personal property; and

        (2) Awnings, carpeting, household appliances, outdoor antennas and outdoor equipment;

        whether or not attached to buildings;

        Replacement cost loss settlement will also apply to the following articles or classes of property if they are separately described and specifically insured in this policy and not subject to agreed value loss settlement:

        (1) Jewelry;

        (2) Furs and garments:

            (a) Trimmed with fur; or

            (b) Consisting principally of fur;

        (3) Cameras, projection machines, films and related articles of equipment;

        (4) Musical equipment and related articles of equipment;

        (5) Silverware, silver-plated ware, goldware, gold-plated ware and pewterware, but excluding:

            (a) Pens or pencils;

(b) Flasks;

(c) Smoking implements; or

(d) Jewelry; and

(6) Golfer's equipment meaning golf clubs, golf clothing and golf equipment.

Replacement cost loss settlement will not apply to other classes of property separately described and specifically insured.

We will pay no more than the least of the following amounts:

(1) Replacement cost at the time of loss without deduction for depreciation;

(2) The full cost of repair at the time of loss;

(3) The limit of liability that applies to Coverage C, if applicable;

(4) Any applicable special limits of liability stated in this policy; or

(5) For loss to any item separately described and specifically insured in this policy, the limit of liability that applies to the item.

If the cost to repair or replace the property described in a. above is more than $2,500, we will pay no more than the actual cash value for the loss until the actual repair or replacement is complete.

You may make a claim for loss on an actual cash value basis and then make claim for any additional liability in accordance with this endorsement provided you notify us of your intent to do so within 180 days after the date of loss.

Property listed below is not eligible for replacement cost settlement. We will not pay more than the actual cash value at the time of loss or the amount required to repair or replace, whichever is less, for any of the following:

(1) Antiques, fine arts, paintings and similar articles of rarity or antiquity which cannot be replaced.

(2) Memorabilia, souvenirs, collectors items and similar articles whose age or history contribute to their value.

(3) Articles not maintained in good or workable condition.

(4) Articles that are outdated or obsolete and are stored or not being used.

b. Structures that are not buildings; and

Grave markers and mausoleums;

at actual cash value at the time of loss but not more than the amount required to repair or replace.

c. Buildings under Coverage A or B are settled at replacement cost without deduction for depreciation, subject to the following:

(1) We will pay the cost to repair or replace, after application of deductible and without deduction for depreciation, but not more than the least of the following amounts:

(a) The limit of liability under this policy that applies to the building, plus any additional amount that may be provided under paragraph c.(2)(c) below;

(b) The replacement cost of that part of the building damaged with material of like kind and quality and for like use; or

(c) The necessary amount actually spent to repair or replace the damaged building.

If the building is rebuilt at a new premises, the cost described in (b) above is limited to the cost which would have been incurred if the building had been built at the original premises.

(2) If you have:

(a) Allowed us to adjust the Coverage A limit of liability and the premium in accordance with:

(i) The property evaluations we make; and

(ii) Any increases in inflation; and

(b) Notified us, within 30 days of completion, of any improvements, alterations or additions to the building which increase the replacement cost of the building by 5% or more;

Then, if there is a loss to the dwelling that exceeds the Coverage A limit of liability shown in the Declarations, for the purposes of settling that loss only,

(c) We will provide an additional amount of insurance up to ____%* of the Coverage A limit of liability, provided you elect to repair or replace the damaged or destroyed dwelling.

(3) We will pay no more than the actual cash value of the damage until actual repair or replacement is complete.

However, if the cost to repair or replace the damage is less than $2,500, we will settle the loss according to the provisions of **b.(1)** above whether or not actual repair or replacement is complete.

(4) You may disregard the replacement cost loss settlement provisions and make claim under this policy for loss or damage to buildings on an actual cash value basis. You may then make claim for any additional liability on a replacement cost basis, provided you notify us of your intent to do so within 180 days after the date of loss.

## SECTION II – LIABILITY COVERAGES
## COVERAGE E – PERSONAL LIABILITY

This section is deleted and replaced by the following:

If a claim is made or a suit is brought against any "insured" for damages because of "bodily injury", "personal injury" or "property damage" caused by an "occurrence" to which this coverage applies, we will:

1. Pay up to our limit of liability for the damages for which the "insured" is legally liable. Damages include prejudgment interest awarded against the "insured"; and

2. Provide a defense at our expense by counsel of our choice, even if the suit is groundless, false or fraudulent. We may investigate and settle any claim or suit that we decide is appropriate. Our duty to settle or defend ends when our limit of liability is exhausted by the payment of a judgment or settlement.

## SECTION II - ADDITIONAL COVERAGES

Additional Coverages **3.** and **4.** are amended as follows:

### 3. Damage To Property of Others.

We agree to pay at replacement cost and to increase the limit of liability that applies to this additional coverage by $500 per "occurrence".

### 4. Loss Assessment.

We agree to increase the limit of liability that applies to this Additional Coverage by the amount of $4,000.

## SECTION II - EXCLUSIONS

Exclusion **B.2.c.(2)** is deleted and replaced by the following:

(2) One or more outboard engines or motors with:

    (a) 50 total horsepower or less; or

    (b) More than 50 horsepower if the outboard engine or motor is not owned by an "insured";

    (c) More than 50 horsepower if the outboard engine or motor is owned by an "insured" who acquired it during the policy period, or:

    (d) More than 50 horsepower if the outboard engine or motor is owned by an "insured" who acquired it before the policy period, but only if:

        (1) You declare them at policy inception; or

        (2) Your intent to insure them is reported to us in writing within 45 days after you acquire them.

The coverages in **(c)** and **(d)** above apply for the policy period.

Exclusion **C.3.** is deleted and replaced by the following:

3. "Property damage" to property rented to, occupied or used by or in the care of the "insured". This exclusion does not apply to "property damage" caused by fire, smoke, explosion, or water damage;

Exclusion **C.8.** is added as follows:

8. "Personal Injury":

    a. Arising out of an act an "insured" commits or conspires to commit with the knowledge that the act would violate the rights of another and would inflict "personal injury";

    b. Arising out of oral, written or electronic publication of material, if done by or at the direction of an "insured" with knowledge of its falsity;

    c. Arising out of oral, written or electronic publication of material whose first publication took place before the beginning of the policy period;

    d. Arising out of a criminal act an "insured" commits or conspires to commit;

    e. Arising out of liability assumed by an "insured" under any contract or agreement except any indemnity obligation assumed by an "insured" under a written contract directly re-

lating to the ownership, maintenance or use of the premises;

f.  Sustained by any person as a result of an offense directly or indirectly related to the employment of this person by the "insured";

g.  Arising out of or in connection with a "business" conducted from an "insured location" or engaged in by an "insured", whether or not the "business" is owned or operated by an "insured" or employs an "insured". This exclusion applies but is not limited to an act or omission, regardless of its nature or circumstance, involving a service or duty rendered, promised, owed, or implied to be provided because of the nature of the "business";

h.  Arising out of civic or public activities performed for pay by an "insured";

i.  To you or an "insured" as defined under Definition 7.a. or b.

    This exclusion also applies to any claim made or suit brought against you or an "insured":

    (1)  To repay; or

    (2)  Share damages with;

    another person who may be obligated to pay damages because of "personal injury" to an "insured"; or

j.  Arising out of the actual, alleged or threatened discharge, dispersal, seepage, migration, release or escape of pollutants at any time. This includes any loss, cost or expense arising out of any:

    (1)  Request, demand or order that an "insured" or others test for, monitor, clean up, remove, contain, treat, detoxify or neutralize, or in any way respond to, or assess the effects of, pollutants; or

    (2)  Claim or suit by or on behalf of a governmental authority for damages because of testing for, monitoring, clean up, removing, containing, treating, detoxifying or neutralizing, or in any way responding to, or assessing the effects of pollutants.

    Pollutants means any solid, liquid, gaseous or thermal irritant or contaminant, including smoke, vapor, soot, fumes, acids, alkalis, chemicals and waste. Waste includes materials to be recycled, reconditioned or reclaimed.

## SECTION II - CONDITIONS

1.  **Limit of Liability** is deleted and replaced by the following:

1.  **Limit of Liability.** Our total liability under Coverage E for all damages resulting from any one "occurrence" will not be more than the Coverage E limit of liability shown in the Declarations plus $100,000. This limit is the same regardless of the number of "insureds", claims made or persons injured. All "bodily injury" and "property damage" resulting from any one accident or from continuous or repeated exposure to substantially the same general harmful conditions shall be considered to be the result of one "occurrence". All "personal injury" resulting from a series of related offenses shall be considered to be the result of one offense.

    Our total liability under Coverage F for all medical expense payable for "bodily injury" to one person as the result of one accident will not be more than the limit of liability for Coverage F as shown in the Declarations plus $1,000.

*Entry may be left blank if shown in the Declarations for this coverage.

All other provisions of this policy apply.

HO-312 (06-06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## WINDSTORM OR HAIL PERCENTAGE DEDUCTIBLE
### ALL FORMS EXCEPT HO-4, HO-6 AND HV-6

Windstorm or Hail Deductible Percentage Amount: *

*Entry may be left blank if shown in the Declarations for this coverage.

### DEDUCTIBLE

The following special deductible is added to the policy:

With respect to the peril of Windstorm or Hail, we will pay only that part of the total of all loss payable under Section I that exceeds the windstorm or hail percentage deductible.

The dollar amount of the windstorm or hail deductible is determined by multiplying the Coverage A limit of liability shown in the Declarations by the deductible percentage amount shown above. No other deductible in the policy applies to loss caused by windstorm or hail.

All other provisions of this policy apply.

HO-455 (06-06)

## THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.

## IDENTITY FRAUD EXPENSE COVERAGE

For an additional premium, the following Additional Coverage is added under Section I.

### IDENTITY FRAUD EXPENSE

We will pay up to $25,000 for "expenses" incurred by an "insured" as the direct result of any one "identity fraud" discovered during the policy period. Additionally, you will have access to "resolution services" from a consumer fraud specialist who will assist you in the process of restoring your identity.

Any act or series of acts committed by any one person or group of persons acting in concert or in which any one person or group of persons is concerned or implicated is considered to be one "identity fraud", even if a series of acts continues into a subsequent policy period.

### DEFINITIONS

With respect to the provisions of this endorsement only, the following definitions are added:

"Expenses" means:

1. Costs for notarizing fraud affidavits or similar documents for financial institutions or similar credit grantors or credit agencies that have required that such affidavits be notarized.

2. Costs for certified mail to law enforcement agencies, credit agencies, financial institutions or similar credit grantors.

3. Lost wages as a result of time taken off from work:

   a. To meet with, or talk to, law enforcement agencies, credit agencies and/or legal counsel;

   b. To complete fraud affidavits; or

   c. Due to wrongful incarceration arising solely from someone having committed a crime in the "insured's" name. Lost wages shall not apply in the case of wrongful incarceration absent all charges being dropped or an acquittal of the "insured".

   The most we will pay is $1,000 per week for a maximum period of five weeks.

4. Loan application fees for re-applying for a loan or loans when the original application is rejected solely because the lender received incorrect credit information.

5. Reasonable attorney fees incurred, with our prior consent, for:

   a. Defense of lawsuits brought against the "insured" by merchants or their collection agencies,

   b. The removal of any criminal or civil judgments wrongly entered against an "insured", and

   c. Challenging the accuracy or completeness of any information in a consumer credit report.

6. Charges incurred for long distance telephone calls to merchants, law enforcement agencies, financial institutions or similar credit grantors, or credit agencies to report or discuss an actual "identity fraud".

7. Costs for daycare and eldercare incurred by an "insured" solely as a direct result of any one "identity fraud".

"Identity fraud" means the act of knowingly transferring or using, without lawful authority, a means of identification of an "insured" with the intent to commit, or to aid or abet, any unlawful activity that constitutes a violation of federal law or a felony under any applicable state or local law.

"Resolution services" include ordering your credit report, alerting credit reporting agencies, providing credit monitoring, and preparing documentation and letters. You are limited to a maximum of three 6-month enrollments with the consumer fraud specialist we provide to you for any one "identity fraud".

"Resolution services" are not available to any individual under 14 years old and is limited to those services not involved in the obtaining of credit report information for any individual aged 14-17 years old.

### EXCLUSIONS

The following additional exclusions apply to this coverage.

We do not cover:

1. Loss arising out of "business" pursuits of any "insured".

2. "Expenses" incurred due to any fraudulent, dishonest or criminal act by an "insured" or any person acting in concert with an "insured", or by any authorized representative of an "insured", whether acting alone or in collusion with others.

**3.** Loss other than "expenses" or "resolution services".

## DEDUCTIBLE

No deductible applies to "identity fraud" coverage.

## YOUR DUTIES AFTER LOSS

The following is added under Condition **2.** Duties After Loss, paragraph **h.**:

**(9)** Receipts, bills or other records that support your claim for "expenses" under "identity fraud" coverage.

All other provisions of this policy apply.

HO-493 (06-06)

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## ACTUAL CASH VALUE LOSS SETTLEMENT
## WINDSTORM OR HAIL LOSSES TO ROOF SURFACING
### (All Forms Except HO-4)

### SECTION I – CONDITIONS

This endorsement modifies the Section I – Loss Settlement Condition in the policy form with respect to a covered loss for roof surfacing caused by the peril of windstorm or hail. Such loss will be subject to actual cash value loss settlement. Therefore, the loss settlement conditions that pertain to "repair or replacement cost without deduction for depreciation" are changed as noted below:

**3. Loss Settlement.**

In all Forms except HO-6:

1. Paragraph a.(3) is deleted and replaced by the following:

    a.(3) Structures that are not buildings, including their roof surfacing; and

2. The following is added to Paragraph a.:

    (5) Roof surfacing on structures that are buildings if a loss to the roof surfacing is caused by the peril of windstorm or hail.

3. In Paragraph b., the introductory statement "Buildings covered under Coverage A or B at replacement cost without deduction for depreciation, subject to the following": is deleted and replaced by the following:

    b. Buildings covered under Coverage A or B, except for their roof surfacing if the loss to the roof surfacing is caused by the peril of windstorm or hail, at replacement cost without deduction for depreciation, subject to the following:

In Form HO-6, Condition 3. Loss Settlement is deleted and replaced by the following:

**3. Loss Settlement.** Covered property losses are settled as follows:

a. Property of the following types:

    (1) Personal property and grave markers, including mausoleums; and

    (2) Roof surfacing if the loss is caused by the peril of windstorm or hail;

    at actual cash value at the time of loss but not more than the amount required to repair or replace.

b. Coverage A, except for roof surfacing if loss is caused by the peril of windstorm or hail:

    (1) If the damage is repaired or replaced within a reasonable time, at the actual cost to repair or replace;

    (2) If the damage is not repaired or replaced within a reasonable time, at actual cash value but not more than the amount required to repair or replace.

In this provision, the terms "repaired" or "replaced" do not include the increased costs incurred to comply with the enforcement of any ordinance or law, except to the extent that coverage for these increased costs is provided in Additional Coverage 11. Ordinance Or Law.

All other provisions of this policy apply.

**THIS ENDORSEMENT CHANGES THE POLICY. PLEASE READ IT CAREFULLY.**

## SPECIAL PROVISIONS – OKLAHOMA

### SECTION I – EXCLUSIONS

The first paragraph of this section is deleted and replaced by the following:

We do not cover any direct or indirect loss or damage caused by, resulting from, contributing to or aggravated by any of these excluded perils. Loss from any of these perils is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

These exclusions apply whether or not the loss event:

    (1) Results in widespread damage;

    (2) Affects a substantial area; or

    (3) Occurs gradually or suddenly.

These exclusions also apply whether or not the loss event arises from:

    (1) Any acts of nature;

    (2) Any human action or inaction;

    (3) The forces of animals, plants or other living or dead organisms; or

    (4) Any other natural or artificial process.

2. **Earth Movement** is deleted and replaced by the following:

2. **Earth Movement**, meaning events that include but are not limited to the following:

    a. Earthquake and earthquake aftershocks;

    b. Volcano activity including but not limited to:

        1. Volcanic Eruption;

        2. Volcanic Explosion;

        3. Effusion of volcanic material; or

        4. Lava Flow;

    c. Mudslide, including mudflow, debris flow, landslide, avalanche, or sediment;

    d. Sinkhole;

    e. Subsidence;

    f. Excavation collapse;

    g. Erosion;

    h. Any expansion, shifting, rising, sinking, contracting, or settling of the earth, soil or land.

This exclusion applies whether or not the earth, soil or land is combined or mixed with water or any other liquid or natural or man made material.

However, loss caused directly by the specific perils:

    a. fire;

    b. explosion;

    c. breakage of building or dwelling glass or safety glazing material, including storm doors or windows; or

    d. theft;

following any earth movement is covered.

3. **Water Damage** is deleted and replaced by the following:

3. **Water damage**, meaning;

    a. Flood, surface water, ground water, storm surge, waves, wave wash, tidal water, tsunami, seiche, overflow of a body of water, or spray from any of these, whether or not a result of precipitation or driven by wind;

    b. any water or water borne material that enters through or backs up from a sewer or drain, or which overflows from a sump, sump pump or related equipment;

    c. any water or water borne material located below the surface of the ground including water or water borne material:

        (1) Which exerts pressure on, seeps, leaks or flows into:

            (a) Any part of the dwelling or other structures;

            (b) The foundation of the dwelling or other structures;

            (c) Any paved surface located on the "residence premises"; or

            (d) Any spa, hot tub, or swimming pool.

        (2) Which causes earth movement; or

    d. any overflow, release, migration or discharge of water in any manner from a dam, levee, dike, hurricane barrier or any water or flood control device.

Direct loss by fire, explosion or theft resulting from "water damage" will be covered.

**8.** **Intentional Loss** is deleted and replaced by the following:

**8.** **Intentional Loss**

   (a) We do not provide coverage for any loss arising out of any act an "insured" commits or conspires to commit with the intent to cause a loss.

   (b) However, this exclusion will not apply to deny an "insured's" claim for an otherwise covered property loss under this policy if such loss is caused by an act of domestic violence by another "insured" under this policy and the "insured" making claim:

      (1) Did not cooperate in or contribute to the creation of the loss; and

      (2) Cooperates in any investigation relating to the loss.

   We may apply reasonable standards of proof for such claims.

   (c) If we pay a claim pursuant to paragraph **8.(b)**, our payment to the "insured" is limited to that "insured's" insurable interest in the property less any payments we first made to a mortgagee or other party with a secured interest in the property. In no event will we pay more than the limit of liability.

## SECTION I – CONDITIONS

**6.** **Loss Payment** is deleted and replaced by the following:

**6.** **Loss Payment**. We will adjust all losses with you. We will pay you unless some other person is named in the policy or is legally entitled to receive payment.

   Loss will be payable:

   a. Within 60 days after we reach an agreement with you or there is a filing of an appraisal award with us; or

   b. Within 30 days after there is an entry of a final judgment.

**7.** **Appraisal** is deleted and replaced by the following:

**7.** **Appraisal**. If you and we fail to agree as to the actual cash value or the amount of loss, either party may make written demand for an appraisal of the loss. In this event, only the party which demanded the appraisal will be bound by the results of that appraisal. Each party will choose a

competent and disinterested appraiser within 20 days after the written demand has been made. The two appraisers will choose a competent and disinterested umpire. If they cannot agree upon an umpire within 15 days, then, at the request of either you or us, after notice of hearing to the nonrequesting party by certified mail, the umpire shall be selected by a judge of a district court in the county where the loss occurred. The appraisers will separately state the actual cash value and loss to each item. If the appraisers submit a written report of agreement to us, the amount agreed upon will be the amount of loss and will be binding on that party which demanded the appraisal. If they fail to agree, they will submit their differences to the umpire. A decision agreed to by any two will set the amount of actual cash value and loss and will be binding on that party which demanded the appraisal.

Each party will:

a. Pay its own appraiser; and

b. Bear the expenses of the appraisal and umpire equally.

The following Condition is added:

**Our Duties After Loss**. It shall be our duty, after receiving a proof of loss, to submit a written offer of settlement or rejection of the claim to you within forty-five (45) days of receipt of the proof of loss.

## SECTION II – ADDITIONAL COVERAGES

The following additional coverage is added:

**5.** **Property Damage Coverage For Military Personnel and Federal Government Employees**.

   If an "insured" is:

   a. A United States Government Employee; or

   b. A member of the United States Military,

   We agree to pay for "property damage" to United States government property, for which such "insured" is responsible under applicable rules or regulations.

   Payment for such "property damage" will be at replacement cost. Under this endorsement "replacement cost" is defined as the amount necessary to repair or replace the damaged property with no deduction for depreciation, subject to the Limit of Liability for this Additional Coverage.

   Our Limit of Liability, per "occurrence", under this Additional Coverage for all damages resulting from any one "occurrence" shall not exceed

two months basic pay for the "insured", as of the time of the "occurrence".

We will not pay for "property damage" to:

a. Aircraft;

b. "Motor vehicles";

c. Watercraft; or

d. Weapons.

We will not pay for "property damage":

a. To the extent of any amount payable under Section I of this policy; or

b. Caused intentionally by any "insured" who is 13 years of age or older.

All other provisions of this policy apply.

This policy is signed for the company which is the insurer under this policy.

*Wendy C. Skj*

Wendy C. Skjerven
Senior Vice President and
Corporate Secretary

*Joy/ach*

Joseph Lacher
Chief Executive Officer
Personal Lines

**IN WITNESS WHEREOF, the Company has executed and attested these presents.**

PL-9107 8-97

EXHIBIT C



**TRAVELERS**

**Bryan C. Jones**
*Property Claims Representative*
*P. O. Box 35974*
*Tulsa, OK 74013*
*Cell Number:    918 409-6041*
*FAX Number    888-845-9720*
*Email:  bcjones@travelers.com*

5 August 2011

Robert and Mary Myers
1117 N. Gum Ave.
Broken Arrow, OK 74012

| | |
|---|---|
| Claim Number: | HIL3690 |
| Insured: | Robert and Mary Myers |
| Reported Date of Loss: | 25 April 2011 |
| Loss Location: | 1117 N. Gum Ave. Broken Arrow, OK 74012 |
| Type of Loss: | Ground Movement/Settling |

Dear Mr. and Mrs. Myers,

The letter will confirm our receipt of the referenced claim for the above listed property.

During our inspection of your property on July 15, 2011, we inspected the damage sustained to your residence. Our inspection of the interior of your home revealed cracks and separation in the sheetrock on your walls and ceiling as well as sinking of your concrete substrate. It was also brought to our attention that a drain leak was detected below the slab in the southeast bedroom of your home.

Our visual inspection of the loss suggests that the damage was caused by foundation settling and/or ground movement. Unfortunately, as we discussed during the investigation of your claim, the effective Homeowners Policy does not cover such damage, as settling and earth movement are specifically excluded. Furthermore, the policy excludes any repairs to the drain line itself, as it was damaged gradually over time by wear, tear, rust, and deterioration.

It was also observed that, while your plumber detected a leak in the drain line below the slab foundation of your home, no direct water damage or intrusion was sustained to the home itself. Unfortunately, due to the lack of water intrusion within the home, no coverage is available for access or excavation.

For your reference, as follows is language taken from your Homeowners Policy, form HO-3 (10/06), which details the coverage denial on your claim:

### SECTION I – PERILS INSURED AGAINST

### COVERAGE A – DWELLING AND COVERAGE B – OTHER STRUCTURES

1.  We insure against risk of direct physical loss to property described in Coverages A and B.

2.  We do not insure, however, for loss:

**a.** Excluded under Section I – Exclusions;

**c.** Caused by:

    (5)    Constant or repeated seepage or leakage of water or steam, or the presence of humidity, moisture or vapor, that occurs over a period of 14 days or more; or

    (6)    Any of the following:

        **(a)**    Wear and tear, marring, deterioration;

        **(b)**    Mechanical breakdown, latent defect, inherent vice, or any quality in property that causes it to damage or destroy itself.

        **(c)**    Smog, rust or other corrosion;

        **(f)**    Settling, shrinking, bulging, or expansion, including resultant cracking, of bulkheads, pavements, patios, footings, foundations, walls, floors, roofs or ceilings.

**Exception to c. (6)**

Unless the loss is otherwise excluded, we cover loss to property covered under Coverage A or B resulting from an accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance on the "residence premises." This included the cost to tear out and replace any part of a building, or other structure, on the "residence premises," but only when necessary to repair the system or appliance. However, such tear out and replacement coverage only applies to other structures if the water or steam caused actual damage to a building on the "residence premises."

We do not cover for loss to the system or appliance from which this water or steam escaped.

For purpose of this provision, a plumbing system or household appliance does not include a sump, sump pump, or related equipment or a roof drain, gutter, downspout, or similar fixtures or equipment.

## SECTION I – EXCLUSIONS

**B.**    We do not insure for loss to property described in Coverages A and B caused by any of the following. However, any ensuing loss to property described in Coverages A and B not excluded by any other provision in this policy is covered.

    **1.**    Weather conditions. However, this exclusion applies only if weather conditions contribute in any way with a cause or event excluded in A. above to produce the loss.

2.   Acts or decisions, including the failure to act or decide, of any person, group, organization, or governmental body.

3.   Faulty, inadequate, or defective:

   a.   Planning, zoning, development, surveying, siting;

   b.   Design, specifications, workmanship, repair, construction, renovation, remodeling, grading, compaction;

   c.   Materials use in repair, construction, renovation, or remodeling;

   d.   Maintenance;

of part or all of any property whether or not on or off the "residence premises."

## HO-300 OK (03-09): SPECIAL PROVISIONS – OKLAHOMA

## SECTION I – EXCLUSIONS

The first paragraph of this section is deleted and replaced by the following:

We do not cover any direct or indirect loss or damaged caused by, resulting from, contributing to or aggravated by any of these excluded perils. Loss from any of these perils is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.

These exclusions apply whether or not the loss event:

   (1) Results in widespread damage

   (2) Affects a substantial area; or

   (3) Occurs gradually or suddenly

These exclusions also apply whether or not the loss event arises from:

   (1)   Any acts of nature

   (2)   Any human action or inaction

   (3)   The forces of animals, plants or other living or dead organisms; or

   (4)   Any other natural or artificial process.

2.   **Earth Movement** is deleted and replaced by the following:

2.   **Earth Movement**, meaning events that include but are not limited to:

   a.   Earthquake and earthquake aftershocks;

   d.   Sinkhole;

e.    Subsidence

f.    Excavation collapse;

g.    Erosion;

h.    Any expansion, shifting, rising, sinking, contracting, or settling of the earth, soil or land.

This exclusion applies whether or not the earth, soil or land is combined or mixed with water or any other liquid or natural or man made material.

This correspondence is not intended to be, nor shall it be construed as an exhaustive listing or discussion of policy terms, conditions, exclusions or endorsements, facts or circumstances, or principles of insurance law which may further provide a basis to preclude coverage in this matter. The Travelers Home and Marine Insurance Company reserves the right to supplement its declination should information, not currently known, indicate the applicability of additional grounds

The Travelers Home and Marine Insurance Company encourages you to contact the undersigned and /or submit in writing any additional documentation or material that you feel may impact upon our coverage position for further review and consideration. I have provided my email address should you wish to correspond via electronic mail.

The Travelers Home and Marine Insurance Company reserves the right to review this coverage decision in light of any new information.

If you have any questions or concerns regarding this claim, please contact me at your convenience.

Sincerely,

Bryan Jones
Outside Property Claims Professional
*The Travelers Home and Marine Insurance Company*

CC:    Albright Insurance Agency
        P.O. Box 1147
        Ponca City, OK 74602

# EXHIBIT D



## SMITH, ROLFES & SKAVDAHL
### COMPANY LPA

**Admitted to Practice:**

*Ohio*
*Kentucky*
*Florida*
*Michigan*
*District of Columbia*

**Matthew J. Smith, Esq.**
600 Vine Street, Suite 2600
Cincinnati, Ohio 45202
(513) 579-0080
msmith@smithrolfes.com

December 30, 2011

***VIA ELECTRONIC MAIL***

Mr. Bryan C. Jones
Travelers Insurance
P.O. Box 35974
Tulsa, Oklahoma 74013

   Re: *Robert Myers & Mary Myers v. Travelers (not in suit)*
     Claim No.: HIL3690
     Our Clients: Mr. Robert Myers and Ms. Mary Myers
     Date of Loss: April 25, 2011
     Our File No.: 11-12738

Dear Mr. Jones:

   As you are already aware, Robert and Mary Myers have retained Scott L. Tully, Esq. with respect to the above-referenced claim. Please note your claim file to reflect the undersigned and our firm have been retained as co-counsel on behalf of Mr. & Mrs. Myers. While we do not practice law in Oklahoma, at the current time we are assisting Mr. Tully and shall petition the Court for admission should litigation become necessary, however, we hope such is not the case.

   While we still reviewing this matter, based upon our initial evaluation of this claim and the legal analysis by Mr. Tully as local counsel, we are respectfully requesting Travelers reconsider the denial of this claim as set forth in your letter of August 5, 2011 to Mr. and Mrs. Myers. Based upon the facts of the claim, the relevant policy provisions, a professional engineer's report, and relevant case law we sincerely believe Travelers has improperly denied this claim and is presently in breach of its obligations to its insureds, the Myers. We demand Travelers immediately provide coverage for loss sustained by the Myers due to this incident as their damages continue to mount and they are forced to incur monetary expenses loss for what is clearly a covered claim.

Mr. Bryan Jones
December 30, 2011
Page 2

### TRAVELERS' DENIAL LETTER

In its denial letter, Travelers acknowledges a drain leak was detected beneath the slab in the southeast bedroom of the Myers' home. However, Travelers advised that their merely visual inspection of the damage "suggests" it was caused by "foundation settling and/or ground movement", and therefore any damage is precluded from coverage. In addition, Travelers advised there is no coverage for damage for repairs to the drain line. Finally, because there was no water intrusion within the home, "no coverage is available for access or excavation."

### ENGINEER'S REPORT

The Myers retained a licensed professional engineer, Shahriyar Ebady-Nezami, P.E., employed with Associated Engineers & Inspectors, Inc., to conduct an inspection of their home to assess "site structural and drainage deficiencies." The inspection occurred on April 25, 2011. A copy of the engineer's report is included with this letter.

The engineer observed *"[t]he interior concrete slab under south central part of the original house has dished causing the sheet rock cracks over the interior doors and openings."* The engineer concluded "*[t]his settlement, in our opinion, is likely due to a plumbing leak."*

The engineer made the following initial recommendations, subject to revision as work progressed: (1) underpinning the interior foundation slab with a total of nine (9) interior piers; and (2) performance of a hydrostatic leak test before and after the underpinning.

### POLICY PROVISIONS

#### *HO-300 OK (03-09): SPECIAL PROVISIONS – OKLAHOMA*

#### *SECTION I – EXCLUSIONS*

*The first paragraph of this section is deleted and replaced by the following:*

*We do not cover any direct or indirect loss or damage caused by, resulting from, contributing to or aggravated by any of these excluded perils. Loss from any of these perils is excluded regardless of any other cause or event contributing concurrently or in any sequence to the loss.*

...

2.      **Earth Movement** *is deleted and replaced by the following:*

2.      **Earth Movement**, *meaning events that include but are not limited to the following:*

Mr. Bryan Jones
December 30, 2011
Page 3

    a.    *Earthquake and earthquake aftershocks;*

...

    d.    *Sinkhole;*

    e.    *Subsidence;*

    f.    *Excavation collapse;*

    g.    *Erosion;*

    h.    *Any expansion, shifting, rising, sinking, contracting, or settling of the earth, soil or land.*

*This exclusion applies whether or not the earth, soil or land is combined or mixed with water or any other liquid or natural or man made material.*

### *HO-15 (10-06): SPECIAL PERSONAL PROPERTY COVERAGE*

### *SECTION I – PERILS INSURED AGAINST*

*The Perils Insured Against under Coverages A, B and C are deleted and replaced by the following:*

*We insure against risk of direct physical loss to property described in Coverages A, B and C.*

*We do not insure, however, for loss:*

1.    *Under Coverages A, B and C:*

    a.    *Excluded under SECTION 1- EXCLUSIONS;*

...

    c.    *Caused by:*

...

    (4)    *Constant or repeated seepage or leakage of water or steam, or the presence or condensation of humidity, moisture or vapor, that occurs over a period of 14 days or more; or*

Mr. Bryan Jones
December 30, 2011
Page 4

    (5)    *Any of the following:*

        *(a)*    *Wear and tear, marring, deterioration;*

...

        *(c)*    *Smog, rust or other corrosion;*

...

        *(f)*    *Settling, shrinking, bulging or expansion, including resultant cracking, of pavements, patios, foundations, walls, floors, roofs or ceilings;*

...

### *Exception To c.(5)*

*Unless the loss is otherwise excluded, we cover loss to property covered under Coverages A, B and C resulting from an accidental discharge or overflow of water or steam from within a plumbing, heating, air conditioning or automatic fire protective sprinkler system or household appliance on the "residence premises". This includes the cost to tear out and replace any part of a building, or other structure, on the "residence premises", but only when necessary to repair the system or appliance. However, such tear out and replacement coverage only applies to other structures if the water or steam causes actual damage to a building on the "residence premises."*

*We do not cover loss to the system or appliance from which this water or steam escaped.*

*For purposes of this provision, a plumbing system or household appliance does not include a sump, sump pump or related equipment or a roof drain, gutter, down spout or similar fixtures or equipment.*

*Under items 1. b. and c., any ensuing loss to property described in Coverages A, B and C not excluded by any other provision in this policy is covered.*

Mr. Bryan Jones
December 30, 2011
Page 5

## **TRAVELERS' DENIAL IS IMPROPER**

Although Travelers cited a number of policy provisions for the basis of its denial, we will only address those specifically relied upon in the body of its letter to the Myers.

### Earth Movement Exclusion

Travelers relies on the "Earth Movement" exclusion as amended by HO-300 OK (03-09), "Special Provisions – Oklahoma", cited above. This exclusion is inapplicable in this instance and is not intended to exclude the present loss.

*First*, subsections of the earth movement exclusion provide examples of what constitutes "earth movement". The majority of these examples are catastrophic and dramatic in nature (e.g. earthquake, sinkhole, excavation collapse…). No "earth movement" of this sort has happened with regard to the Myers' home. If Traveler's possesses any information to the contrary we would request that information be provided fully and completely to our firm, Mr. Tully and your insureds.

*Second*, there is already reported case law from the Oklahoma Appeals Court addressing an "earth movement" exclusion as applied to almost identical facts. See *Duensing v. State Farm Fire & Cas. Co.*, 131 P.3d 127, (Okla. Civ. App. 2005). In *Duensing*, the insured homeowners suffered damage to their residence as a result of a leak in a hot water pipe under the foundation slab of their home, which ultimately resulted in cracks to their walls and "settling" of the foundation slab. At issue on appeal were two exclusions which the insurer attempted to rely upon to deny coverage, "earth movement" and "settling". The court concluded because the exclusion was ambiguous with regard to what constituted "earth", and because there was no evidence of any actual earth movement, the matter had properly been submitted for the jury's consideration. If Traveler's possesses any knowledge of case law or statutory law to the contrary we welcome your providing this information, otherwise we believe this case is clearly controlling regarding Traveler's duties to your insureds regarding this claim.

*Third*, there is no indication there has been any "earth movement", whatever meaning may be ascribed to that phrase. The engineer retained by the Myers reported "*the interior concrete slab under the south central part of the original house has dished causing the sheetrock cracks over interior door openings. This settlement, in our opinion, is likely due to plumbing leak."* We are wholly unaware of any evidence Traveler's has provided to your insureds or Mr. Tully as counsel to contradict the findings of the professional engineer which Traveler's denial has forced your insureds to retain to evaluate this claim. We would appreciate Traveler's explanation as to why the company felt compelled to deny coverage to your insureds without the benefit of even having a professional engineer investigate this loss. Please advise if this is the normal policy of Traveler's to deny claims based solely on visual inspections by claims personnel?

Mr. Bryan Jones
December 30, 2011
Page 6

        In summary, we strongly believe the earth movement exclusion is not intended to
preclude coverage for this type of loss and does not apply to the facts of this claim.

### The Settling "Exclusion"

        Travelers also relies on the preclusive "settling" language contained in Section I – Perils
Insured Against, as amended by HO-15 (10-06) "Special Personal Property Coverage", cited
above. Travelers incorrectly cites the basic policy form in its denial letter, despite this
endorsement, however, the language cited by Travelers is the same as in subsection 1.c.(5)(f) of
the endorsement. This provision is in effect an exclusion.

        Unlike the earth movement exclusion, the settling exclusion could arguably initially
apply as it precludes coverage caused by "settling... including results in cracking, of pavements,
patios, foundations, walls, floors, roofs or ceilings...." However, there is an important and
crucial exception to the exclusion, "Exception To c.(5), which applies specifically to the
accidental discharge of water from within a plumbing system. This exception directly applies to
the facts of this claim.

        A Texas court contemplated the effect of a similar "accidental discharge of water
exception" to a similar settling exclusion. *Balandran v. Safeco Ins. Co. of America*, 972 S.W.2d
738 (Tex. 1998). Like the present instance, in *Balandran*, the insureds incurred damage to their
home caused by an underground plumbing leak which in turn caused the soil to expand,
damaging the home's foundation. The policy did not cover loss "caused by settling, cracking,
bulging, shrinkage, or expansion of foundations, walls, ceilings, roof structures..." However, a
named peril contained under a different coverage section provided coverage for "Accidental
Discharge, Leakage or Overflow of Water or Steam from within a plumbing...system."
Coverage included the costs of tear out and replacement of any part of the building necessary to
replace the system. The policy further provided the aforementioned "settling exclusion" did not
apply to loss caused by this peril (referred to as the "exclusion repeal provision"). The court
concluded that the settling exclusion did not apply to the insured's loss. The case demonstrates
an underground plumbing leak is an "accidental discharge of water" for purposes of the
exception to exclusion c.(5). We very much believe the Oklahoma court will adopt the same
view in interpreting the Traveler's policy should litigation be instituted.

        Moreover, the exception applied in this manner is already supported under Oklahoma
law. In *Duensing*, *supra*, an insurer attempted to rely on a settling exclusion to deny coverage to
the homeowners for their loss. The court concluded the homeowners could rely on Oklahoma's
*Efficient Proximate Cause Doctrine* to contend the damage at issue was in fact caused by the
drain leak under the slab, although there was resulting settling of the foundation. "In
determining the cause of the loss for the purpose of fixing insurance liability when *concurring*
causes of the damage appear, the proximate cause is the dominate or efficient one that sets the
other causes in operation; incidental causes are not proximate though they may be nearer in time
and place to the loss." *Id.* at ¶ 16, citing *Shirey v. Tri-State Ins. Co.*, 274 P.2d 386 (Okla. 1954).

Mr. Bryan Jones
December 30, 2011
Page 7

The *Duensing* court stated if an insured can demonstrate the proximate cause of the loss is covered under the policy, the entire loss is covered even if an event in the chain of causation was excluded from coverage.

The Efficient Proximate Cause Doctrine applies to this claim. The Efficient Proximate Cause Doctrine in this instance is clearly the drain leak, which falls within the specific exception to the settling exclusion.

### Additional Claimed Grounds for Denial

In addition to the provisions discussed above, Travelers also refers to additional grounds to preclude coverage for at least a portion of the loss sustained by the Myers. Like their improper reliance on the earth movement and settling exclusion, Travelers has no basis to rely on this additional policy language to deny any part of the damage sustained by the Myers.

*First*, Travelers contends there is no coverage for repairs to the drain line itself because "it was damaged over time by wear, tear, rust and deterioration." We find this assertion without any merit. There is nothing to indicate any inspection, either by Travelers or others, resulted in any finding or conclusion as to the cause of the leak. However, it *is* clear that the drain leak is the cause of the damage to the Myers' home. Please advise how Traveler's based on a visual inspection by claims personnel only was able to make this definitive conclusion.

*Second*, Travelers also asserts "due to the lack of water intrusion within the home, no coverage is available for access and excavation." It appears in reaching this position Travelers relies on the "Exception To c.(5)" language contained in the amended "Section I – Perils Insured Against" portion of the policy, cited above. This is an improper interpretation and application of the provision.

The provision provides for loss caused to property resulting from "accidental discharge...of water...from within a plumbing...system...on the 'residence premises'" which "includes the cost to tear out and replace any part of the building, or other structure...". Tear out and replacement coverage is not provided for an "other structure", unless "the water or steam causes actual damage to a building on the 'residence premises'." This limitation, however, has no application to this claim, because here the damage is to the insured's dwelling, not an "other structure." There is no limitation under the policy for tear and out replacement costs to the Myers' home and primary dwelling, regardless of whether water has caused actual damage to the building.

All of the loss sustained to the Myers' home from the drain leak is covered pursuant to "Exception To c.(5)", including the costs for tear out and replacement.

Mr. Bryan Jones
December 30, 2011
Page 8

### Personal Property Coverage

Though not addressed in Travelers' denial, endorsement H0-15 (10-06) to the policy effectively transforms the HO-3 policy from "Named Peril" personal property coverage to "All-Risk" personal property coverage. Again, Travelers incorrectly cites the basic policy form rather than the HO-15 endorsement in its denial letter. Therefore, to the extent the Myers have sustained loss to their personal property, they are entitled to coverage under the policy subject to the corresponding limits of liability.

### CONCLUSION

Mr. and Mrs. Myers have incurred significant cost in repairing the damage to their home caused by the drain leak beneath their foundation slab, which resulted in settling and subsequent cracks to their walls, ceilings, etc. They will continue to incur significant costs as the repairs continue.

As outlined above, Travelers has wrongfully denied coverage for the Myers' loss, and currently is in breach of its obligations under the Myers' insurance policy and continues to act in bad faith toward your insureds. We respectfully request Travelers reconsider its denial in light of our position, and will issue a reversal of its denial within fourteen (14) days of receipt of this correspondence. Upon receipt of Travelers' reversal, we will gladly work with Travelers in the handling of the Myers' claim, and will provide detailed reports/receipts for all costs incurred by the Myers in the repair of their home.

Nothing contained in the foregoing should be construed as a waiver of any rights the Myers have under the relevant policy. The Myers specifically reserve all of their rights under the policy and at law. Thank you for your attention to this request.

Please include Mr. Tully on all future correspondence.

Sincerely yours,

Matthew J. Smith

MJS/WCT:lp/klf
Enclosure: (*Engineer's Report*)

cc:     Robert and Mary Myers *(via electronic mail)*
        Scott L. Tully, Esq. *(via electronic mail)*

# EXHIBIT E

**Westlaw Delivery Summary Report for MITCHELL,IAN DOU**

| | |
|---|---|
| Date/Time of Request: | Monday, February 6, 2012 09:29 Central |
| Client Identifier: | MITCHELL IAN |
| Database: | OK-CS |
| Citation Text: | 131 P.3d 127 |
| Lines: | 888 |
| Documents: | 1 |
| Images: | 0 |

The material accompanying this summary is subject to copyright. Usage is governed by contract with Thomson Reuters, West and their affiliates.

Westlaw.

FOR EDUCATIONAL USE ONLY                                Page 1

131 P.3d 127, 2006 OK CIV APP 15
**(Cite as: 131 P.3d 127)**

☞

Court of Civil Appeals of Oklahoma,
Division No. 1.
Ted DUENSING and Louise Duensing, Plaintiffs/
Appellees,
v.
STATE FARM FIRE AND CASUALTY COM-
PANY, Defendant/Appellant.

No. 98,668.
Released for Publication by Order of the Court of
Civil Appeals of Oklahoma, Division No. 1. Aug.
26, 2005.
Certiorari Denied Nov. 14, 2005.

**Background:** Insureds brought action against
homeowners insurer to recover for breach of con-
tract and bad faith by refusing to pay for cracks and
settling as result of plumbing leak under founda-
tion. The District Court, Tulsa County, J. Michael
Gassett, J., entered judgment on jury verdict for in-
sureds. Insurer appealed.

**Holdings:** The Court of Civil Appeals, Adams, P.J.,
held that:
(1) lead-in clause to earth movement exclusion was
unambiguous in avoiding application of the effi-
cient proximate cause doctrine;
(2) "earth" in earth movement exclusion was am-
biguous as applied to sand fill under house;
(3) jury question existed on application of earth
movement exclusion;
(4) lead-in clause to exclusion of coverage for set-
tling, cracking, or shrinking did not circumvent the
efficient proximate cause doctrine;
(5) jury question existed on application of exclu-
sion for settling or cracking; and
(6) insurer acted reasonably in withholding pay-
ment and was not liable on bad faith theory.

Affirmed in part and reversed in part.

West Headnotes

**[1] Appeal and Error 30 ☞893(1)**

30 Appeal and Error
30XVI Review
30XVI(F) Trial De Novo
30k892 Trial De Novo
30k893 Cases Triable in Appellate
Court
30k893(1) k. In general. Most Cited
Cases
Denial of motion for directed verdict requires a
de novo or non-deferential review.

**[2] Appeal and Error 30 ☞927(7)**

30 Appeal and Error
30XVI Review
30XVI(G) Presumptions
30k927 Dismissal, Nonsuit, Demurrer to
Evidence, or Direction of Verdict
30k927(7) k. Effect of evidence and
inferences therefrom on direction of verdict. Most
Cited Cases
On appeal from denial of motion for directed
verdict, the Court of Civil Appeals, like the trial
court, regards as true all evidence that is favorable
to the opponent of the motion together with all
reasonable inferences to be drawn from it and dis-
regards conflicting evidence favorable to the mov-
ing party.

**[3] Insurance 217 ☞2165(2)**

217 Insurance
217XVI Coverage—Property Insurance
217XVI(A) In General
217k2139 Risks or Losses Covered and
Exclusions
217k2165 Proximate Cause
217k2165(2) k. Combined or con-
current causes. Most Cited Cases
The "efficient proximate cause doctrine" ap-
plies in determining the cause of a loss for the pur-
pose of fixing insurance liability when concurring

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

131 P.3d 127, 2006 OK CIV APP 15
(Cite as: 131 P.3d 127)

causes of the property damage appear; the proximate cause is the dominant or efficient one that sets the other causes in operation, incidental causes are not proximate though they may be nearer in time and place to the loss, and if the insured successfully demonstrates that the proximate cause of the loss is covered under the policy, the entire loss is covered notwithstanding the fact that an event in the chain of causation was specifically excluded from coverage.

**[4] Insurance 217 ☜1721**

217 Insurance
    217XIII Contracts and Policies
        217XIII(A) In General
            217k1720 Validity and Enforceability
                217k1721 k. In general. Most Cited
Cases

**Insurance 217 ☜ 1807**

217 Insurance
    217XIII Contracts and Policies
        217XIII(G) Rules of Construction
            217k1807 k. Function of, and limitations on, courts, in general. Most Cited Cases

**Insurance 217 ☜2097**

217 Insurance
    217XV Coverage—in General
        217k2096 Risks Covered and Exclusions
            217k2097 k. In general. Most Cited Cases

Parties to an insurance policy are at liberty to contract for insurance to cover such risks as they see fit and are bound by terms of the contract; it necessarily follows that courts are not at liberty to rewrite the terms of an insurance contract.

**[5] Insurance 217 ☜1808**

217 Insurance
    217XIII Contracts and Policies
        217XIII(G) Rules of Construction
            217k1808 k. Ambiguity in general. Most Cited Cases

When addressing a dispute concerning the language of an insurance policy, a court's first step is to determine as a matter of law whether the policy language at issue is ambiguous.

**[6] Insurance 217 ☜1822**

217 Insurance
    217XIII Contracts and Policies
        217XIII(G) Rules of Construction
            217k1822 k. Plain, ordinary or popular sense of language. Most Cited Cases

If an insurance policy it is not ambiguous, courts accept the language in its plain, ordinary, and popular sense.

**[7] Insurance 217 ☜1810**

217 Insurance
    217XIII Contracts and Policies
        217XIII(G) Rules of Construction
            217k1810 k. Construction as a whole. Most Cited Cases

**Insurance 217 ☜1816**

217 Insurance
    217XIII Contracts and Policies
        217XIII(G) Rules of Construction
            217k1815 Reasonableness
                217k1816 k. In general. Most Cited Cases

**Insurance 217 ☜1835(1)**

217 Insurance
    217XIII Contracts and Policies
        217XIII(G) Rules of Construction
            217k1830 Favoring Insureds or Beneficiaries; Disfavoring Insurers
                217k1835 Particular Portions or Provisions of Policies
                    217k1835(1) k. In general. Most Cited Cases

**Insurance 217 ☜1835(2)**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

131 P.3d 127, 2006 OK CIV APP 15
**(Cite as: 131 P.3d 127)**

217 Insurance
  217XIII Contracts and Policies
    217XIII(G) Rules of Construction
      217k1830 Favoring Insureds or Benefi-
ciaries; Disfavoring Insurers
        217k1835 Particular Portions or Provi-
sions of Policies
        217k1835(2) k. Exclusions, excep-
tions or limitations. Most Cited Cases

Courts must construe insurance policy to give a
reasonable effect to all provisions, construing liber-
ally words of inclusion in favor of the insured and
construing strictly words of exclusion against the
insurer.

**[8] Insurance 217 ⬿1817**

217 Insurance
  217XIII Contracts and Policies
    217XIII(G) Rules of Construction
      217k1815 Reasonableness
        217k1817 k. Reasonable expectations.
Most Cited Cases

**Insurance 217 ⬿ 1818**

217 Insurance
  217XIII Contracts and Policies
    217XIII(G) Rules of Construction
      217k1815 Reasonableness
        217k1818 k. Reasonable persons. Most
Cited Cases

Under the "reasonable expectations doctrine,"
the meaning of ambiguous or uncertain language in
an insurance policy is not what the drafter intended
it to mean; it is what a reasonable person in the pos-
ition of the insured would have understood it to
mean.

**[9] Insurance 217 ⬿ 2165(2)**

217 Insurance
  217XVI Coverage—Property Insurance
    217XVI(A) In General
      217k2139 Risks or Losses Covered and
Exclusions

        217k2165 Proximate Cause
          217k2165(2) k. Combined or con-
current causes. Most Cited Cases

Lead-in clause to earth movement and other ex-
clusions of homeowners insurance policy was un-
ambiguous in avoiding application of the efficient
proximate cause doctrine, and, thus, reasonable ex-
pectations doctrine was inapplicable; the clause
made exclusions applicable regardless of the cause
of the excluded event, other causes of the loss, or
the action of covered causes of loss concurrently or
in any sequence with the excluded event to produce
the loss.

**[10] Insurance 217 ⬿2144(1)**

217 Insurance
  217XVI Coverage—Property Insurance
    217XVI(A) In General
      217k2139 Risks or Losses Covered and
Exclusions
        217k2144 Movement of Earth or
Structure
          217k2144(1) k. In general. Most
Cited Cases

"Earth" in earth movement exclusion of
homeowners insurance policy was ambiguous as
applied to sand fill under house where plumbing
leak occurred; it could either refer to the natural
crust or solid surface of the earth or the multitude
of materials that compose the earth's soil.

**[11] Insurance 217 ⬿ 2202**

217 Insurance
  217XVI Coverage—Property Insurance
    217XVI(A) In General
      217k2202 k. Questions of law or fact.
Most Cited Cases

Dispute over facts necessary to apply earth
movement exclusion to settling of house slab and
cracking of walls due to water leak under founda-
tion created jury question on application of that ex-
clusion in homeowners insurance policy.

**[12] Insurance 217 ⬿2165(2)**

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

131 P.3d 127, 2006 OK CIV APP 15
**(Cite as: 131 P.3d 127)**

217 Insurance
    217XVI Coverage—Property Insurance
       217XVI(A) In General
          217k2139 Risks or Losses Covered and
Exclusions
          217k2165 Proximate Cause
            217k2165(2) k. Combined or con-
current causes. Most Cited Cases
    Lead-in clause to homeowners insurance policy
exclusion of coverage for settling, cracking, or
shrinking did not circumvent the efficient proxim-
ate cause doctrine with regard to settling and crack-
ing allegedly caused by plumbing leak under found-
ation; the clause excluded coverage for loss which
consisted of, or was directly and immediately
caused by, a listed peril, but it failed to explicitly
and specifically disclaim coverage for losses that
arose from a combination of excluded and covered
causes, regardless of the sequence in which the
various causes occurred.

**[13] Insurance 217 ☞2202**

217 Insurance
    217XVI Coverage—Property Insurance
       217XVI(A) In General
          217k2202 k. Questions of law or fact.
Most Cited Cases
    Evidence of more than one possible concurring
cause for loss from settling of foundation and
cracking of walls, e.g., the water leak and erosion,
created jury question on application of homeowners
insurance policy exclusion for settling and crack-
ing.

**[14] Insurance 217 ☞3335**

217 Insurance
    217XXVII Claims and Settlement Practices
       217XXVII(C) Settlement Duties; Bad Faith
          217k3334 In General
            217k3335 k. In general. Most Cited
Cases

**Insurance 217 ☞3336**

217 Insurance
    217XXVII Claims and Settlement Practices
       217XXVII(C) Settlement Duties; Bad Faith
          217k3334 In General
            217k3336 k. Reasonableness of in-
surer's conduct in general. Most Cited Cases
    Tort liability may be imposed only where there
is a clear showing that the insurer, unreasonably
and in bad faith, withholds payment of the claim of
its insured.

**[15] Insurance 217 ☞3336**

217 Insurance
    217XXVII Claims and Settlement Practices
       217XXVII(C) Settlement Duties; Bad Faith
          217k3334 In General
            217k3336 k. Reasonableness of in-
surer's conduct in general. Most Cited Cases
    Bad faith cannot exist if an insurer's conduct
was reasonable under the circumstances.

**[16] Insurance 217 ☞3336**

217 Insurance
    217XXVII Claims and Settlement Practices
       217XXVII(C) Settlement Duties; Bad Faith
          217k3334 In General
            217k3336 k. Reasonableness of in-
surer's conduct in general. Most Cited Cases
    An insurer clearly has the right to resist pay-
ment and litigate any claim to which the insurer has
a reasonable defense.

**[17] Insurance 217 ☞3335**

217 Insurance
    217XXVII Claims and Settlement Practices
       217XXVII(C) Settlement Duties; Bad Faith
          217k3334 In General
            217k3335 k. In general. Most Cited
Cases
    Resort to a judicial forum is not per se bad
faith or unfair dealing on the part of the insurer re-
gardless of the outcome of the suit; in such circum-
stances the insurer does not risk a tortious breach of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

131 P.3d 127, 2006 OK CIV APP 15
**(Cite as: 131 P.3d 127)**

[18] **Insurance 217** ⬅️➡️**3336**

217 Insurance
  217XXVII Claims and Settlement Practices
    217XXVII(C) Settlement Duties; Bad Faith
      217k3334 In General
        217k3336 k. Reasonableness of insurer's conduct in general. Most Cited Cases

A claim must be paid promptly unless the insurer has a reasonable belief that the claim is legally or factually insufficient; the decisive question is whether the insurer had a good faith belief, at the time its performance was requested, that it had justifiable reason for withholding payment under the policy.

[19] **Insurance 217** ⬅️➡️**3361**

217 Insurance
  217XXVII Claims and Settlement Practices
    217XXVII(C) Settlement Duties; Bad Faith
      217k3358 Settlement by First-Party Insurer
        217k3361 k. Investigations and inspections. Most Cited Cases

To determine the validity of the claim, the insurer must conduct an investigation reasonably appropriate under the circumstances; knowledge and belief of the insurer during the time period the claim is being reviewed is the focus of a bad faith claim.

[20] **Insurance 217** ⬅️ ⋯⋯**3419**

217 Insurance
  217XXVIII Miscellaneous Duties and Liabilities
    217k3416 Of Insurers
      217k3419 k. Bad faith in general. Most Cited Cases

**Insurance 217** ⬅️➡️**3426**

217 Insurance
  217XXVIII Miscellaneous Duties and Liabilities
    217k3426 k. Actions in general; evidence.

Most Cited Cases

**Insurance 217** ⬅️⋯⋯**3571**

217 Insurance
  217XXXI Civil Practice and Procedure
    217k3571 k. Pleading. Most Cited Cases

In pursuing a claim of breach of a insurer's duty of good faith and fair dealing, the plaintiff carries the burden of proof and must plead the elements of this intentional tort, the essence of the tort being the unreasonable bad faith conduct of the insurer.

[21] **Insurance 217** ⬅️➡️**3360**

217 Insurance
  217XXVII Claims and Settlement Practices
    217XXVII(C) Settlement Duties; Bad Faith
      217k3358 Settlement by First-Party Insurer
        217k3360 k. Duty to settle or pay. Most Cited Cases

**Insurance 217** ⬅️➡️**3361**

217 Insurance
  217XXVII Claims and Settlement Practices
    217XXVII(C) Settlement Duties; Bad Faith
      217k3358 Settlement by First-Party Insurer
        217k3361 k. Investigations and inspections. Most Cited Cases

The elements of prima facie case of insurer's bad faith for failing to pay claim for property loss were as follows: (1) insurer was required under the policy to pay the claim; (2) insurer's refusal to pay the claim in full was unreasonable under the circumstances because (a) it had no reasonable basis for the refusal, (b) it did not perform a proper investigation, or (c) it did not evaluate the results of the investigation properly; (3) insurer did not deal fairly and in good faith with insureds; and (4) insurer's violation of its duty of good faith and fair dealing was the direct cause of the injury sustained by insureds.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

**[22] Insurance 217 ⟵⟶3337**

217 Insurance

217XXVII Claims and Settlement Practices
217XXVII(C) Settlement Duties; Bad Faith
217k3334 In General
217k3337 k. Absence of coverage;
coverage disputes in general. Most Cited Cases

An insurer's withholding of payment is not un-
reasonable or bad faith when there is a legitimate
dispute concerning coverage and when there is no
conclusive precedential legal authority on that is-
sue.

**[23] Insurance 217 ⟵...3360**

217 Insurance

217XXVII Claims and Settlement Practices
217XXVII(C) Settlement Duties; Bad Faith
217k3358 Settlement by First-Party In-
surer
217k3360 k. Duty to settle or pay.
Most Cited Cases

Homeowners insurer acted reasonably in with-
holding payment of claim for settling and cracking
as result of plumbing leak under foundation, and,
thus, the insurer was not liable on bad faith theory;
a legitimate dispute existed in interpreting exclu-
sions for earth movement and settling and cracking,
no court had settled the questions of interpretation,
the initial denial was based on claims specialist's
many years of experience with the causes of a leak-
ing pipe, his investigation of the premises, and his
interpretation of policy exclusions, and nothing in-
dicated that alleged failure to perform a proper in-
vestigation was the direct or proximate cause of in-
sureds' loss.

**[24] Insurance 217 ⟨ ····3376**

217 Insurance

217XXVII Claims and Settlement Practices
217XXVII(C) Settlement Duties; Bad Faith
217k3373 Amount and Items Recoverable
217k3376 k. Punitive damages. Most
Cited Cases

There can be no punitive damages award
against an insurer where there is no bad faith award
for handling of claim.

**\*130** Appeal from the District Court of Tulsa
County, Oklahoma; Honorable J. Michael Gassett,
Trial Judge.

AFFIRMED IN PART AND REVERSED IN
PART.Stephen Q. Peters, R. Lynn Thompson, Har-
ris, Gordon, McMahan, Peters & Thompson, P.C.,
Tulsa, OK, for Plaintiffs/Appellees.

William R. Cathcart, Virginia Cathcart Holleman,
Cathcart & Dooley, Oklahoma City, OK, for De-
fendant/Appellant.

**OPINION**
ADAMS, Presiding Judge.

¶ 1 Ted Duensing and his wife, Louise Duens-
ing, (collectively Insureds) sued State Farm Fire
and Casualty Company (Insurer) for breach of the
parties' insurance contract, its duty of good faith
and fair dealing (bad faith) and punitive damages.
After a jury trial, verdicts were returned in favor of
the Insureds, awarding them $24,160.13 for breach
of contract damages, $175,000 for bad faith, and
$300,000 in punitive damages. Insurer appeals the
trial court's judgment, based on the jury's verdicts,
which included an award of Insureds' attorney fees
and costs and pre- and post-judgment interest on
their contractual and non-contractual claims.

¶ 2 Insurer alleges the trial court "erred as a
matter of law by submitting to the jury" Insureds'
claims for breach of contract, bad faith, and punit-
ive damages. Insurer's fourth proposition alleges er-
ror in the trial court's award of prejudgment interest
on the jury's bad faith award, arguing only that if
we reverse the judgment for the bad faith claim,
this award must also be reversed.

[1][2] ¶ 3 Denial of Insurer's motion for direc-
ted verdict requires a *de novo* or non-deferential re-
view, *see Computer Publications, Inc. v. Welton*,
2002 OK 50, 49 P.3d 732. In ruling on such a re-

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

Case 4:12-cv-00056-CVE-PJC   Document 2 Filed in USDC ND/OK on 02/09/12   Page 78 of 100

quest, this court, like the trial court, regards as true all evidence that is favorable to the opponent of the motion together with all reasonable inferences to be drawn from it and disregards conflicting evidence favorable to the moving party. *Harder v. F.C. Clinton, Inc.,* 1997 OK 137, 948 P.2d 298. In reviewing the trial court's decision, we must examine the record and make a determination whether there is any evidence reasonably tending to support the judgment. *Thomason v. Pilger,* 2005 OK 10, 112 P.3d 1162. We have applied these principles in the description of the following facts.

### FACTS

¶ 4 Insureds have lived in their home for 26 years, and, since 1989, have renewed their homeowners policy with Insurer on an annual basis. On or about June 2, 1998, Insureds thought they could hear water running and while checking out the source, discovered a warm spot on their kitchen floor. After Mr. Duensing remembered running out of hot water during his shower the night before, he checked the water meter, turned off the water to the hot water heater, and concluded they must have a leak in a hot water pipe under the slab of their home. The next day, Insureds called the office of their local agent, Mark Webber, seeking a recommendation for a plumber who could determine where the leak was without tearing up the entire kitchen floor. Webber was unavailable and his office personnel did not know of anyone, however, believing Insureds were calling in a claim for the leak, submitted the information to Insurer's main office. That same day, Fred Harris, a claims specialist for Insurer, telephoned Insureds, asking Mrs. Duensing whether they had received any water damage to their house. When she stated she did not know yet because Leak Locators could not come until Monday morning, Mr. Harris explained that without any water damage to the inside of their house, there was no coverage under their policy. Mrs. Duensing gave Mr. Harris permission to come to their house before Leak Locator would arrive, although **\*131** she thought he should wait to see what Leak Locators found.

¶ 5 On June 5, 1998, Mr. Harris arrived about 15 minutes before Leak Locators. He visited briefly with Insureds, took two pictures of the kitchen area and one of the front of the house, and explained to Insureds that because they had no damage to the inside of their house, their policy did not cover the leaking pipe or the costs of tearing out the floor to repair the leaking pipe. Upset with Mr. Harris' denial of coverage and not liking his attitude, Insureds escorted him out of their house. Upon leaving, Mr. Harris called the local agent to explain what had happened, learned that Mrs. Duensing had already called to complain, and as a result, asked the local agent to follow up on Insureds' claim. Sometime after Mr. Harris left, Leak Locators discovered a leaking pipe with a pinhole size hole in it. Because Mr. Harris' visit made it clear there would be no coverage, Insureds did not file a claim with Insurers.

¶ 6 Having had no communications with either the local agent or Insureds since June 5th, Mr. Harris wrote Insureds a letter dated June 9, 1998, explaining that during their meeting he had "made an inspection of the [kitchen] area, and did not find any water *inside the home* from that possible leak" and that the policy could "only extend coverage for the cost of tearing out and replacing the slab and flooring *if there is first a covered loss from the water.* The cost to repair the pipe *is not a covered loss, as plumbing normally breaks because of corrosion, rust, normal wear, or a latent defect.*" (Emphasis added.) Mr. Harris then quoted two separate exclusions from Insureds' policy upon which he was relying for denial of their claim that address the causes emphasized above and one exclusion the parties refer to as the "continuous leakage exclusion." FN1

> FN1. The three provisions, none of which are raised by Insurer on appeal, provide, in pertinent part:
>
> f. continuous or repeated seepage or leakage of water or steam from a: ... (3) plumbing system, ... which occurs over a

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

period of time. If a loss to covered property is caused by water or steam not otherwise excluded, we will cover the cost of tearing out and replacing any part of the building necessary to repair the system or appliance from which the water or steam escaped;

g. Wear, tear, scratching, marring, deterioration, inherent vice, latent defect or mechanical breakdown;

h. Corrosion, electrolysis or rust;

¶ 7 A few months later, Insureds noticed that cracks had developed on several walls in their house and that the slab was settling in places. They hired an architect, Bob Hale, who investigated the premises and eventually submitted to Insureds a "Structural Report," concluding that "in our opinion, the settlement of the floor was directly caused by the plumbing leak that occurred in the kitchen in June, 1998. We also feel that the movement of the south wall in the dining room and kitchen is a result of the moisture on the exterior foundation." Insureds called their local agent's office on February 22, 1999, wanting to file a claim for the new damage but asking for someone other than Mr. Harris to do the inspection, and were told they would check with the adjuster to see if their file could be "reopened." That same day, William Steuernagel, a claims teams manager for Insurer, returned Insureds' call and left a message, which Mr. Duensing returned the next day, reporting "cracks in the walls and settling" and agreeing to meet with Mr. Steuernagel at Insureds' home to review their claim.

¶ 8 On February 25, 1999, Mr. Steuernagel inspected Insurers' home, during which time he found cracks "in the living room, family room, kitchen, and laundry walls and ceilings" and "in an upstairs bedroom and exterior area outside the kitchen" and that "the floor area in the kitchen had dropped in several areas." Thereafter, Mr. Steuernagel "sat down with insured and explained lack of coverage due to settling" and "tried to explain the policy" to

Mr. Duensing, who thereafter told him "it wasn't settling, it was water damage." The next day, Mr. Steuernagel wrote Insureds a denial letter, detailing the June 2, 1998 Loss, his findings on February 25, 1999, and his explanation that same day "that there [is] no coverage for the settling." As "the basis of this denial," Mr. Steuernagel set out in the letter the same three exclusions Mr. Harris relied upon, with the addition**132** of two more that address "settling" of the residence and "earth movement."

¶ 9 After a written complaint to the Oklahoma Insurance Commissioner and numerous letters between their attorney and Mr. Steuernagel did not change Insurer's denial of Insureds' claim, they filed this action against Insurer on June 23, 1999. The matter was ultimately tried to a jury, during which two days Insureds' counsel called Insurer's agents, Mr. Harris and Mr. Steuernagel, and Insureds, as witnesses, and admitted numerous exhibits, including the policy, and Insurer's claim and photo files.

¶ 10 After Insureds rested, Insurer moved for a directed verdict, which the trial court denied. Insurer rested, without calling any witnesses, and the case was submitted to the jury, whose verdicts in favor of Insureds [FN2] are the basis of the trial court's judgment from which Insurer filed its appeal.

> FN2. There were two separate verdict forms in this case, the first in which the jury found in favor of the Insureds on their breach of contract and their bad faith claim and then specifically found "by clear and convincing evidence" that Insurer (1) recklessly disregarded its duty to deal fairly and act in good faith with its insureds *and* (2) intentionally and with malice breached its duty to deal fairly and act in good faith with its insureds. In the "Verdict Form—Second Stage," the jury also found in favor of Insureds and awarded punitive damages in the amount of $300,000.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

131 P.3d 127, 2006 OK CIV APP 15
(Cite as: 131 P.3d 127)

### ANALYSIS
#### *Breach of Insurance Contract*

¶ 11 Insurer first alleges that the trial court erred as a matter of law by submitting to the jury Insureds' breach of contract claim, arguing their losses under the policy are excluded from coverage by two separate provisions of the "Section 1—Losses Not Insured" section—the "settlement exclusion" and the "earth movement exclusion."

#### The Policy

¶ 12 Under Section 1—Losses Insured, the first paragraph, entitled " **COVERAGE A—DWELLING,**" [FN3] provides that "[w]e insure for accidental direct physical loss to the property described in Coverage A, except as provided in **SECTION 1—LOSSES NOT INSURED.** " (Emphasis in original.) The Losses Not Insured section has two separate paragraphs for the exclusions for insurance coverage that are at issue for the Coverage A property in this case, Insureds' residence. The first paragraph of the Losses Not Insured section provides, in relevant part:

> FN3. **"COVERAGE A—DWELLING,"** as defined under **"SECTION 1—COVERAGES,"** means the "dwelling used principally as a private residence on the **residence premises** shown in the **Declarations,** " which includes, in relevant part, the "foundation, floor slab and footings supporting the dwelling" and the "wall-to-wall carpeting attached to the dwelling." (Emphasis in original.)

1. We do not insure for any loss to the property described in Coverage A which consists of, or is directly and immediately caused by, one or more perils listed in items a. through n. below, regardless of whether the loss occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:

\* \* \* \* \* \*

l. settling, cracking, shrinking ... of pavements, patios, foundations, walls, floors, roofs or ceilings;

The parties refer to subsection (*l* ) as the "settling exclusion."

¶ 13 The second paragraph of the Losses Not Insured section provides, in relevant part:

2. We do not insure under any coverage for any loss which would not have occurred in the absence of one or more of the following excluded events. We do not insure for such loss regardless of: (a) the cause of the excluded event; or (b) other causes of the loss; or (c) whether other causes acted concurrently or in any sequence with the excluded event to produce the loss; or (d) whether the event occurs suddenly or gradually, involves isolated or widespread damage, arises from natural or external forces, or occurs as a result of any combination of these:

$*133$ \* \* \* \* \* \*

b. **Earth movement,** meaning the sinking, rising, shifting, expanding or contracting of the earth, all whether combined with water or not. Earth movement includes but is not limited to earthquake, landslide, mud flow, mudslide, sinkhole, subsidence, erosion or movement resulting from improper compaction, site selection or any other external forces. Earth movement also includes volcanic explosion or lava flow, except as specifically provided in **SECTION I—ADDITIONAL COVERAGES, Volcanic Action.** (Emphasis in original.)

The parties refer to paragraph 2 alone as the "lead-in clause" and section (b) as the "earth movement exclusion."

¶ 14 Addressing paragraph 2 of the Losses Not Insured as a whole, Insurer argues its unambiguous policy language excludes "coverage for damage which would not have occurred in the absence of earth movement" and "regardless of the cause of

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

the earth movement and regardless of any other cause contributing to the loss," and therefore it was error "to fail to direct a verdict in favor of Insurer" and "to submit the interpretation of the policy to the jury." Insurer further argues that "[t]he evidence presented at trial uniformly demonstrated (1) that settling of the slab floor was caused by the erosion of fill materials from beneath the slab and (2) that the settling of the foundation on the south side of the house was due to earth movement caused by the effects of the moisture on the expansive soil indigenous to the region," both of which "types of earth movement ... are explicitly identified in the earth movement exclusion." Insurer lastly argues the trial court erred in its application of the earth movement exclusion, claiming "there is no reasoned basis for distinguishing the erosion of fill material from the erosion or shifting of earth," "there was no evidence there actually had been 'sand fill' under Insureds' house," and "sand is just one type of earth, as are gravel and soil."

¶ 15 Insureds disagree, arguing, in part,[FN4] that the earth movement exclusion is ambiguous and that unlike the out-of-state cases cited by Insurer, Oklahoma recognizes the efficient proximate cause doctrine, the application of which they argue would allow coverage in this case because "the unrefuted evidence at trial was that the efficient proximate cause of all the damage was the original plumbing leak." Because Insureds' argument, if correct, would eliminate application of the earth movement exclusion, we address it first.

> FN4. We say "in part" because Insureds argue that "the policy clearly states that damage to the premises, including the slab, is a covered loss if caused by a sudden discharge of water." Their footnote to that statement, however, cites to "Section 1—Losses Insured, ¶ 12 (p. 8 of policy)," which we note applies to "Coverage B—Personal Property," not "Coverage A—Dwelling," as is involved herein.

[3] ¶ 16 The efficient proximate cause doctrine,

last recognized by the Court in *Shirey v. Tri–State Ins. Co.,* 1954 OK 214. ¶ 0, 274 P.2d 386, applies "in determining the cause of a loss for the purpose of fixing insurance liability when *concurring* causes of the damage appear, the proximate cause is the dominant or efficient one that sets the other causes in operation; incidental causes are not proximate though they may be nearer in time and place to the loss." (Emphasis added.) *If the insured successfully demonstrates that the proximate cause of the loss is covered under the policy,* the entire loss is covered notwithstanding the fact that an event in the chain of causation was specifically excluded from coverage. *See Kelly v. Farmers Insurance Company, Inc.,* 281 F.Supp.2d 1290.

¶ 17 Insurer's response is that the parties contracted out of the efficient proximate cause doctrine, relying on the "lead-in clause"[FN5] immediately preceding that exclusion, which provides, in pertinent part, "[w]e do not insure for such loss *regardless of:* (a) *the cause* of the excluded event; or (b) *other causes* of the loss; or (c) *whether other causes acted concurrently or in any sequence* with the excluded event to produce **\*134** the loss." (Emphasis added.) It further argues the parties of an insurance policy are free to agree that the proximate cause rule will not apply to their contract, relying on the *Shirey* Court's quote of an earlier Oklahoma case that had applied the "proximate cause" rule, *Pennsylvania Fire Ins. Co. v. Sikes,* 1946 OK 142, 168 P.2d 1016, "in the absence of a clear showing that the contracting parties intended to exclude such damage which might be expected to follow as the result of the [proximate cause]." *Shirey.* 1954 OK 214, ¶ 9. 274 P.2d at 388.

> FN5. This clause also has been termed the "anticoncurrent cause provision." *See Kelly v. Farmers Insurance Company, Inc.,* 281 F.Supp.2d 1290.

[4] ¶ 18 Oklahoma law governing insurance coverage disputes is well-established. The foremost principle is that an insurance policy is a contract. Parties are at liberty to contract for insurance to

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

cover such risks as they see fit and they are bound by terms of the contract. It necessarily follows that courts are not at liberty to rewrite the terms of an insurance contract. The interpretation of the policy, with its exclusions, is a law question, unless the facts necessary to apply the decided law question are in dispute. *Wiley v. Travelers Insurance Company,* 1974 OK 147, 534 P.2d 1293.

[5][6][7] ¶ 19 When addressing a dispute concerning the language of an insurance policy, our first step is to determine as a matter of law whether the policy language at issue is ambiguous. *Wynn v. Avemco Ins. Co.,* 1998 OK 75, 963 P.2d 572. If it is not ambiguous, we accept the language in its plain, ordinary and popular sense. *McDonald v. Schreiner,* 2001 OK 58, 28 P.3d 574. We must construe the policy to give a reasonable effect to all of its provisions, *see Cranfill v. Aetna Life Ins. Co.,* 2002 OK 26, 49 P.3d 703, construing liberally words of inclusion in favor of the insured and construing strictly words of exclusion against the insurer, *see McDonald v. Schreiner,* 2001 OK 58, 28 P.3d 574.

[8] ¶ 20 Because insurance contracts are contracts of adhesion due to the unequal bargaining positions of the parties, the Court in *Max True Plastering Co. v. U.S. Fidelity and Guaranty Co.,* 1996 OK 28, 912 P.2d 861. adopted the reasonable expectations doctrine and held that it may apply as a tool to aid the courts in discerning the intention of the parties when the policy language is ambiguous *or* exclusions in the policy are masked by technical or obscure language *or* hidden in a policy's provisions. Under this doctrine, when construing an ambiguity or uncertainty in an insurance policy, the meaning of the language is not what the drafter intended it to mean, but what a reasonable person in the position of the insured would have understood it to mean. *American Economy Insurance Company v. Bogdahn,* 2004 OK 9, 89 P.3d 1051.

[9] ¶ 21 After a careful review of the policy and consideration of *Max True Plastering Co.,* we conclude that the language of the lead-in clause to the earth movement exclusion is unambiguous. The only fair construction of that paragraph is that when more than one cause is involved in a loss which includes one of the excluded events named under the lead-in clause, in this case, earth movement, there is no coverage regardless of whether the causes acted concurrently or in any sequence with the excluded event. Further, like the exclusion in *Spears v. Shelter Mutual Insurance Company,* 2003 OK 66, 73 P.3d 865, the lead-in clause of the earth movement exclusion is neither masked by technical or obscure language nor hidden in the policy. Accordingly, we conclude that the reasonable expectations doctrine is not applicable to the lead-in clause of paragraph 2 of the Losses Not Insured section. We further conclude that the same clause clearly and unambiguously avoids application of the efficient proximate cause doctrine and that Insureds' argument relying thereon must fail. We next address the earth movement exclusion to determine the applicability of the reasonable expectations doctrine.

[10] ¶ 22 The basis for the trial court's denial of Insurer's motion for directed verdict was:

I agree with the Plaintiffs that, at least, arguably, the sand fill is part of the material used to construct the house. The testimony was that it was to insulate the slab from the movement of the earth, and I think, at least, arguably, that would remove it from [the earth movement exclusion] of the section captioned losses not insured.

**\*135** As identified by the trial court and Insurer's appellate argument, the issue is whether the erosion of the "sand fill" constitutes "earth" as that term is used in the policy's earth movement exclusion.

¶ 23 We first note that the term "earth" is not specifically defined under the policy and it is not used anywhere else in the policy. When construing a life insurance policy lacking any definition of "accident," the Court in *Cranfill v. Aetna Life Ins. Co.,* 2002 OK 26, ¶ 7–8, 49 P.3d 703, 706, instructs:

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

The absence of an express definition of a word within the policy does not necessarily render the word ambiguous. Similarly, the fact that a word cannot be precisely defined to make clear its application in every factual situation does not mean the word is ambiguous. Rather, the test to be applied in determining whether a word is ambiguous is whether the word 'is susceptible to two interpretations' on its face.

This test for ambiguity is applied from the standpoint of a reasonably prudent lay person, not from that of a lawyer. In our view, the word accident is not, on its face, susceptible to two interpretations. A reasonably prudent lay person applying for accidental death insurance would understand what an accident is. (Citations omitted.)

¶ 24 Unlike the word "accident," we conclude "earth" *is* susceptible to multiple interpretations, *i.e.*, a reasonably prudent lay person applying for casualty insurance might interpret "earth" to mean "the planet upon which we live," "soil for cultivating," "fragmental material composing part of the surface of the globe: soil, ground, usually distinguished from bedrock" or "areas of land uncovered by water," "the solid footing formed of earth" or "the solid materials that make up the physical globe." *See Webster's Third New International Dictionary* (1961). In the same dictionary, "earth movement" is defined as "differential movement of the earth's crust" or "elevation or subsidence of the land." As defined by the *American Heritage Dictionary* (1986), "earth" means "the planet upon which human beings live, the third planet from the sun," "the land surface of the world" or "soil; dirt." The definition of "earth" in *Black's Law Dictionary* (6th Ed.) is "soil of all kinds, including gravel, clay, loam, and the like, in distinction from the firm rock." Considering the above definitions, the term "earth" is quite broad because it could either refer to the natural crust or solid surface of the earth ( *terra firma* ) or the multitude of materials that compose the earth's soil.

¶ 25 However, all of the examples of earth movement in the exclusion clearly refer to various types of movements of the solid surface of the earth. The cases Insurer cites as holding the earth movement exclusion language is unambiguous and "virtually indistinguishable" from those in this case, in fact, involve water leaks washing out or away from beneath the home, the foundation, slab, footer or other structures "soil," "solid earth," or "ground," which terms clearly suggest the type of earth needed to support such structures—earth's solid surface. In this case, however, there is no evidence that the soil or ground supporting the slab was *washed out or eroded* by the leak in this case.

¶ 26 Further, none of the cases cited by Insurer for its third argument, *i.e.*, no reasoned basis for distinguishing the erosion of fill material from the erosion or shifting of earth, involved a "floating slab." FN6 Unlike those cases, the jury in this case heard undisputed testimony from Bob Hale, the licensed architect hired by Insureds, explaining that (1) Insureds' house was constructed on a "floating slab" which "is a slab that is in no way connected to the stem wall or the foundation. It is left where it can float. It may ***136** settle, it may rise a little bit ... it is left loose for that reason," (2) the purpose of a floating slab is "trying to eliminate cracks in the slab," (3) the fill used "to accommodate the void between the *natural ground* and [the] four inch slab" is mostly "sand fill," (4) traditionally 12–16 inches of sand fill is used, and (5) "there's at least 10 inches of sand fill underneath this slab." (Emphasis added.) Hale further opined that "it was basically the fill being washed out by the leak that caused the slab to settle" and that "the structural damage that we found that was severe was the slab."

FN6. In *Rhoden v. State Farm Fire and Casualty Company*, 32 F.Supp.2d 907 (S.D.Miss.1998), *affirmed by* 200 F.3d 815 (5th Cir. (Miss.),1999), "testing at various depths at the residence," described as a "slab-on-the-ground," found that "*subsurface soils* encountered within the explora-

tion depths of borings made for the investigation included fill materials and natural silty clays." (Emphasis added.) In *Toumayan v. State Farm General Insurance Co.,* 970 S.W.2d 822 (Mo.App. E.D.1998), water from a broken lateral sewer line leading out from the residence to the rear of the property caused the insured's patio and retaining wall to subside and essentially move toward the house. The earth that moved the retaining wall and patio included "various levels of fill which appeared to be the result of previous attempts at repair or remediation."

¶ 27 Further, during cross-examination, when asked what kind of soil is below the concrete slab, Hale said, "I don't know that there's ever [been] a test but the general region is clay." After Hale agreed there also had not been a test "of what was actually under the house," he was asked, "So you have no idea whether there was sand under the house or not?" to which he responded, "I haven't seen a house where there wasn't sand fill, unless it was gravel fill."

[11] ¶ 28 The jury also heard Mr. Hale's testimony during cross-examination:

Q At any rate, if I understand what you—the bottom line of your testimony is, that necessitated all of these repairs, is you had two things: First of all, you had water that escaped that caused swelling of the earth, and caused cracking on the south side?

A I wouldn't—I wouldn't call that a—that much of a problem since the rest of the slab did not go down. If it had been the heaving totally, the rest of the slab would have been affected, too, but it was basically the fill being washed out by the leak that caused the slab to settle.

Mr. Hale later clarified that the movement of the south wall was not from the "heaving" of the clay soil,[FN7] and although he agreed on cross-

examination that "the south side had settled slightly," he disagreed that such settlement was caused from the clay getting wet, swelling and shrinking or from consolidation of the fill. He further explained that the "south wall was—was—to be honest, an afterthought because I really didn't see—figure the south wall as that much of a problem," and that the south wall "was a different situation than what the slab was. The slab was a devastating problem." Considering all of the testimony outlined above, in the light most favorable to Insureds, reasonable persons could differ whether the earth movement exclusion applied to Insureds' loss. Because the facts necessary to apply the earth movement exclusion were in dispute, the trial court did not err in denying Insurer's motion for directed verdict on that issue.

> FN7. To the extent Mr. Hale's testimony may be viewed as conflicting or inconsistent with his prior testimony, *i.e.,* "I feel that the—the moisture from the leak caused the clay to expand and contract under the footing, also," the credibility of this witness and the weight and value of such testimony on the issue of earth movement were questions exclusively for the jury to pass upon. *Nealis v. Baird,* 1999 OK 98, 996 P.2d 438.

[12] ¶ 29 Concerning the settling exclusion, Insurer argues that it applies as a matter of law, without regard to the *cause* of the loss, because the exclusion also applies to damage "consisting of" settling and cracking. [FN8] It further argues that the evidence at trial showed the damage to Insureds' home consisted solely of settling of the floor slab and south wall foundation, cracking of walls which occurred due to the settling, and that Insureds' home had a prior history of settling.

> FN8. Although an issue at trial, the "continuous or repeated seepage or leakage of water" exclusion under paragraph 1 of the Losses Not Insured section is not addressed by Insurer.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

¶ 30 Insureds contend "Insurer's argument ignores the efficient proximate cause doctrine." Agreeing that the policy does not cover losses as a result of *normal* settling, Insureds basically argue their loss does not consist of normal settling because it is a direct result of the sudden accidental discharge of water and that applying the doctrine, there is no loss which is directly caused by settling and the loss was caused by the initial covered peril.

¶ 31 The "consisting of" language upon which Insurer relies is found in paragraph 1 of the Losses Not Insured section, a "lead-in ***137** clause" to the settling exclusion. As a separate exclusion, we first determine if the efficient proximate cause doctrine applies to the settling exclusion with its lead-in clause.

¶ 32 Insurer's "consisting of" argument is identical to that made by the insurer in a mold coverage dispute in *Kelly v. Farmers Insurance Company, Inc.*, 281 F.Supp.2d 1290. There the Court *disagreed* that the policy language "consisting of" was unambiguous, because "consisting of" implied mold was a *loss* in and of itself, and the policy explicitly identified mold as a "peril," which the Court defined as "the cause of a loss to person and property." 281 F.Supp.2d at 1298. The *Kelly* Court further held that in order to contract around the doctrine, the policy provision intended to effect the circumvention must explicitly and specifically disclaim coverage for losses that arise from a combination of excluded and covered causes, regardless of the sequence in which the various causes occurred. Because the provision did not do so and there was evidence that two perils combined to produce the loss, the *Kelly* Court concluded that the policy did not circumvent the efficient proximate cause doctrine and that a question of fact existed regarding the proximate cause of the loss.

¶ 33 We find the policy analysis made in *Kelly* persuasive, and that the identical policy language when applied to "settling" is similarly ambiguous. Moreover, *Kelly's* requirement for circumventing the efficient proximate cause doctrine is compatible with Oklahoma caselaw. *See Richardson v. Allstate*, 1980 OK 157, 619 P.2d 594. Because the lead-in clause to paragraph 1 in this case does not have the same or similar language as the lead-in clause to paragraph 2, which we previously decided clearly and unambiguously circumvents the doctrine, we conclude that paragraph 1 of the Losses Not Insured section of the Policy does not avoid application of Oklahoma's efficient proximate cause doctrine.

[13] ¶ 34 In this case, there is evidence of more than one possible concurring cause for Insureds' loss, *e.g.*, the water leak and erosion. Because there are disputed issues of fact in this case regarding proximate cause, the trial court did not err in denying Insurer's motion for directed verdict on this specific issue.

*Tortious Breach of Insurer's Duty of Good Faith and Fair Dealing*

¶ 35 Insurer further alleges that the trial court erred as a matter of law by submitting to the jury Plaintiff's claim for breach of an insurer's duty to deal fairly and in good faith. In determining that Insureds' loss was excluded from coverage, Insurer argues that (1) it reasonably applied the clear and straightforward policy language, (2) there is a legitimate dispute over the application of the policy exclusions to Insureds' loss, (3) there is no Oklahoma authority which prohibits an insurance company from relying on the earth movement exclusion, and (4) numerous jurisdictions have decided that the same exclusion unambiguously applies to bar coverage where water from a broken plumbing line contributes to "earth movement."

[14][15] ¶ 36 Tort liability may be imposed only where there is a clear showing that the insurer, unreasonably and in bad faith, withholds payment of the claim of its insured. *Christian v. American Home Assurance Co.*, 1977 OK 141, 577 P.2d 899. Under Oklahoma law, bad faith cannot exist if an insurer's conduct was reasonable under the circumstances. *Manis v. Hartford Fire Ins. Co.*, 1984 OK 25, 681 P.2d 760.

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

[16][17] ¶ 37 *Manis* instructs that the tort of bad faith does not foreclose the insurer's right to deny a claim. An insurer clearly has the right to resist payment and litigate any claim to which the insurer has a reasonable defense. Resort to a judicial forum is not *per se* bad faith or unfair dealing on the part of the insurer regardless of the outcome of the suit. In such circumstances the insurer does not risk a tortious breach of contract.

[18][19] ¶ 38 A claim must be paid promptly unless the insurer has a reasonable belief that the claim is legally or factually insufficient. The decisive question is whether the insurer had a good faith belief, *at the time its performance was requested, that it had justifiable reason for withholding payment under the policy*. To determine the **\*138** validity of the claim, the insurer must conduct an investigation reasonably appropriate under the circumstances; knowledge and belief of the insurer during the time period the claim is being reviewed is the focus of a bad faith claim. *Buzzard v. Farmers Ins. Co., Inc.,* 1991 OK 127, 824 P.2d 1105.

[20][21] ¶ 39 In pursuing a claim of breach of a insurer's duty of good faith and fair dealing, the plaintiff carries the burden of proof and must plead the elements of this intentional tort, the essence of the tort being the unreasonable bad faith conduct of the insurer. *McCorkle v. Great Atlantic Insurance Co.,* 1981 OK 128, 637 P.2d 583. As alleged herein, the elements Insureds were required to establish in order to prove a *prima facie* case of Insurer's bad faith are (1) Insurer was required under the insurance policy to pay Insureds' claim; (2) Insurer's refusal to pay the claim in full was unreasonable under the circumstances because (a) it had no reasonable basis for the refusal, (b) it did not perform a proper investigation, or (c) it did not evaluate the results of the investigation properly; (3) Insurer did not deal fairly and in good faith with Insureds; and (4) Insurer's violation of its duty of good faith and fair dealing was the direct cause of the injury sustained by Insureds. *See* OUJI—Civ (2d) 22.2.

[22] ¶ 40 Having affirmed the trial court's denial of Insurer's motion for directed verdict on the breach of contract claim because there were questions of fact for the jury regarding both of the exclusions relied upon by Insurer for its denial of Insureds' claim, the first element was obviously for the jury to decide. However, the same cannot be said as to the second or fourth elements. An insurer's withholding of payment is not unreasonable or bad faith when there is a legitimate dispute concerning coverage and when there is no conclusive precedential legal authority on that issue. *Skinner v. John Deere Insurance Co.,* 2000 OK 18, 998 P.2d 1219.

[23] ¶ 41 The facts in this case demonstrate only that Insurer's conduct in withholding payment of the claim was reasonable. First, there was a legitimate dispute in interpreting both exclusions of the policy, neither of which have been judicially determined by Oklahoma courts. Second, the record reveals that Insurer's initial denial of the claim was based on Mr. Harris' many years of experience with the causes of a leaking pipe, his investigation of the premises, and his interpretation of the policy's exclusions based on the knowledge he had concerning the only loss/damage as of June of 1998—a leaking hot water pipe. The record further demonstrates that Mr. Steuernagel's reliance on additional exclusions for denial of coverage, *i.e.*, the settling and earth movement exclusions, did not arise until after February of 1999, when Insureds first showed him the pipe extracted by Leak Locators in June of 1998 and gave him a copy of Hale's Structural Report. Considering Insurer's knowledge and belief during the time it was reviewing Insureds' claim, the investigation was reasonably appropriate under the circumstances. Third, there is no competent evidence from which a jury could reasonably find that Insurer's alleged failure to perform a proper investigation was the direct or proximate cause of Insureds' loss. Based on *Skinner,* we conclude that the record in this case shows that Insurer acted reasonably, as a matter of law. Accordingly, the trial court erred in not directing a verdict in favor of Insurer

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

131 P.3d 127, 2006 OK CIV APP 15
**(Cite as: 131 P.3d 127)**

on the bad faith claim and that part of its judgment must be reversed.

[24] ¶ 42 As a result of our reversal of Insureds' bad faith claim, we need not address Insurer's proposition alleging error in the trial court's submission of the issue of punitive damages to the jury. There can be no punitive damage award where there is no bad faith award. *Manis v. Hartford Fire Ins. Co.,* 1984 OK 25, 681 P.2d 760. Similarly, our resolution of Insureds' bad faith claim eliminates any need to address Insurer's allegation that the trial court erred in awarding prejudgment interest on the jury's bad faith award.

## CONCLUSION

¶ 43 The trial court's judgment is reversed insofar as it awards Insureds' damages for bad faith, pre-judgment interest on those damages and punitive damages. In all other **\*139** respects, the trial court's judgment is affirmed.

AFFIRMED IN PART AND REVERSED IN PART.

MITCHELL and BELL, JJ., concur.

Okla.Civ.App. Div. 1,2005.
Duensing v. State Farm Fire and Cas. Co.
131 P.3d 127, 2006 OK CIV APP 15

END OF DOCUMENT

© 2012 Thomson Reuters. No Claim to Orig. US Gov. Works.

# EXHIBIT F



Robert Myers
1117 N. Gum Ave.
Broken Arrow, OK  74012

**Date April 26, 2011**
Regarding: 1117 N. Gum Ave., Broken Arrow
Reference: 1104186

Dear Mr. Myers:

On Monday, April 25, 2011, Shahriyar Ebady-Nezami, P.E., of Associated Engineers &
Inspectors Inc. (AEI) conducted an initial visual examination at the address referenced above.

# 1.0 PURPOSE AND SCOPE

The purpose of this report is to observe accessible areas of the facility and document visually
apparent site structural and drainage deficiencies as of the date of inspection.  The scope of this
service is limited to superficial facilities inspection by routine visual means, according to our
provided Limited Inspection Contract.

This inspection does not include examination of existing, past, or potential problems relating to
community drainage characteristics, community sewer and local water supply problems
(chemical or otherwise), flood plain area characteristics, acid rain problems, soil salt problems,
community environmental problems, property history, proposed roads, legislation, impending,
past or ongoing regarding the site and area.

Only those limited aspects of the inspection specifically
stated in this report as being examined were inspected
and evaluated.  All structures have concealed
discrepancies and/or latent defects and these cannot be
discovered and/or reported with a limited visual
inspection.

# 2.0 HISTORICAL BACKGROUND

The inspection began at approximately 10:30 a.m.  The
homeowner (Mr. Robert Myers) was present.

# 3.0 SITE DESCRIPTIONS

The subject property is a West facing, one-story single-
family residential structure with an integral (two-car)



garage.  The foundation appears to be grade-bearing, poured concrete slab (slab-on-grade).
Specific design details of the foundation (bearing depths, reinforcements, fill, footings, etc.) are
unknown.  The exterior walls are conventional wooden stud framing with cementitious brick
masonry veneer and vinyl siding at all elevations.  The roof structure is conventional stick and
prefabricated truss framing.  The roof decking is composite wood (plywood) with a composition
(asphalt) shingle roof covering.

## 3.1 Site Conditions

The visible portions of the site conditions are as follows:

- Exterior concrete cracks, i.e. driveway
- Downspouts need splash block,
- Hairline veneer cracks (1/4" or smaller),
- Separation of the wall from ceiling on the south central part of the house,
- Buckled tape/joint separation at wall corner(s).

# 4.0 STRUCTURAL EVALUATION

## 4.1 Investigative Procedures

To evaluate the performance of the foundation we do the following:

- Identify any visible distress indicating foundation settlement, i.e. structurally significant cracks in the slab, sheetrock cracks, veneer cracks, visible structural frame deficiencies, etc.

- Render our professional opinion of any visible distress significance, i.e. structural (reduced ability to carry loads), functional and/or cosmetic, and recommendations for repair.

## 4.2 Foundation

The foundation's primary function is to provide a stable support for the superstructure, keeping superstructure distress to a minimum. The foundation of this structure appears to consist of cast-in-place concrete slab supported by the surface soils (includes both post-tensioned and conventionally reinforced foundations), with footings that are supported on the surface soils (grade).

### 4.2.1 Perimeter Foundation

The visible portions of the exterior foundation do not indicate evidence of perimeter foundation settlement of the structure. Although minor foundation movement and settlement is typical with shallow footings on expansive soils, this type of settlement would be largely attributable to poor site conditions. Transient saturation can temporarily reduce the bearing capacity of natural soils and/or fill materials. Improvements and/or maintenance of the perimeter drainage would help in reducing future perimeter settlement.

### 4.2.2 Interior Foundation

The interior concrete slab under south central part of the original house has dished causing the sheet rock cracks over interior doors and openings. This settlement, in our opinion, is likely due to plumbing leak.

A slab-on-grade foundation acts as a vapor barrier by resisting soil moisture variations due to evaporative moisture loss and by shielding the under-slab soil from rainfall. Under optimum conditions, the soil moisture under the slab will achieve a degree of equilibrium.

When a plumbing leak occurs under a slab, the moisture equilibrium is distorted. As moisture is added to the soil from the leak, soil and foundation movement often result. The type and degree of movement depends upon soil type and expansiveness, soil density, soil moisture content prior to the leak, the length of time over which the leak has occurred, the quantity of moisture being added to the soil over a given period of time and a few other factors (site-specific geotechnical data is unavailable and beyond the scope of this evaluation).

We recommend having a hydrostatic leak test (plumbing test) performed and, depending on the results, underpinning of the interior foundation.

**Myers Property**                                         Ref: 1104186
AEI  708 W. Oakland St.  Broken Arrow, OK 74012  T 918-251-8910  F 918-251-8672  info@aeiengineering.net
Copyright © Associated Engineers & Inspectors Inc.

### 4.3 Superstructure

The superstructure or framing scheme is the "skeleton" that supports the building enclosure and finishes. The type of superstructures used in this structure appears to be stick and prefabricated truss framing, which spreads the building weight on the foundation.

#### 4.3.1 Roof Framing

The visibility of the attic components and attic structure was limited due to either insulation, roof design, and/or access limitations. The main frame of the structure, including ceiling and roof members, appears to be in acceptable condition with no visible evidence of sagging or deflection(s).

## 5.0 DRAINAGE EVALUATION

Residential ground surface storm drain systems must transport excess moisture away from designated areas where excess water would otherwise prevent the normal use of a residential property. If rainfall is allowed to pond or collect adjacent to a structure built on expansive soil, the structure may be subjected to unscheduled distress caused by swelling bearing soils due to increased soil moisture content. Likewise, perpetually moist ground surfaces limit recreational use of residential yard areas, and can become a breeding ground for disease carrying insect infestations. Water must freely exit the property to assure unrestricted, healthy, and environmentally safe use of land areas within residential property boundaries. Rigorous evaluation of a groundwater formation and flow characteristics is technically possible (using a matrix of test drillings), but largely infeasible within the purview of residential development – and beyond the scope of this inspection.

### 5.1 Soil Moisture

If expansive, the foundation support soils expand and contract due to changes in moisture content. Changes in moisture content can cause very large changes in soil volume when going from a dry to a saturated condition, and vice versa. This movement does not mean the foundation is improperly designed or that it has failed. Uniformity is the goal: uniform moisture content in the soil, uniformly maintained in all areas around the foundation.

If changes in moisture content are uniform, then movement of the foundation will be uniform and less distress will be created in the structure. If changes in moisture content are non-uniform, then there may be differential movement in the foundation. Differential movement can cause greater (and more obvious) distress in the structure.

Leaking pools, leaking plumbing lines, leaking drains, dripping faucets, dripping air conditioning condensate lines, and misdirected water from clogged and broken gutters and downspouts can cause local high moisture contents that can result in differential movement in areas of expansive soils. These conditions should be remedied as soon as possible. Trees in or near the footprint of the foundation, either removed or planted during construction, cause the majority of foundation problems requiring repair in this area.

### 5.2 Soil Erosion

Soil Erosion is the loss of soil from the ground surface. It is a process that is always occurring but it can happen faster if we misuse the land or if the ground surface is not adequately protected with vegetation and drainage swales. The rate of erosion can be increased by removing or limited plant cover, poor grading plans, wind, frost and rain and water runoff. Two of the most common types of soil erosion are water and wind erosion.

Water or splash erosion is the detachment and airborne movement of small soil particles caused by the impact of raindrops on soil. Sheet erosion is the result of heavy rain on bare soil where water flows as a sheet down any gradient carrying soil particles. Where

precipitation rates exceed soil infiltration rates, runoff occurs. Gully erosion results where water flows along a linear depression eroding a trench or gully.

### 5.3 Exterior Grading

The soil, in my opinion, is sufficiently sloped or graded to drain runoff water away from the home. It is extremely important, particularly in areas of expansive soils, that water drains away from the foundation and not be allowed to pond against or near the foundation. Inadequate drainage and grading around a building, and especially those without hard surfaces and surface drains to direct water away, can effect the foundation.

### 5.4 Roof Drainage

Uncontrolled roof rainfall runoff has erode the ground surface along the foundation perimeter and provided a source of excessive and non-uniform water input to the foundation perimeter beam bearing soils. Variances in bearing soil moisture content distribution along the foundation perimeter can result in unscheduled foundation system vertical displacement and rotational movement.

We recommend the installation of rain gutters and downspouts be placed along the entire house perimeter eave lines where the sloping roofline discharges rainfall runoff. The gutters will capture and convey roof rainfall runoff into downspouts discharging onto the ground surface swale, or into a subsurface solid pipe drain system. This type of gutter system will help to eliminate ground surface erosion and prevent excess water accumulations near the foundation system.

### 5.5 Exterior Concrete

There are concrete cracks and/or separations of the exterior slab-on-grade, which are common and generally the result of soil heaving, temperature variation and/or frost penetration beneath the concrete. The concrete is not structurally tied to the main foundation, therefore, these types of deterioration do not affect the structural integrity of the residence. As a preventive measure, we recommend ensuring the patios are sloped to drain water away from the home and water not be allowed to pool, which could result in future damage.

## 6.0 RECOMMENDATIONS

### 6.1 Structural Recommendations

- I recommend underpinning the interior slab in the areas as shown per the attached drawings. (total of nine (9) interior piers). It should be noted that the above determination was general recommendation based on the visual inspection of the property so the number of the piers could differ during the installation. The slab could be surveyed and exact elevation and number of piers to be determined.

- Perform a hydrostatic leak test (plumbing test, both supply and sewer) before and after the underpinning. If leak(s) are detected before the underpinning, the location of the leak(s) should be pinpointed, repaired, left exposed and re-evaluated for possible further recommendations.

- No other structural action is recommended beyond ordinary homeowner maintenance and monitoring. Any evidence of floor settlement or occurrence of cracks should be evaluated by a licensed Professional Engineer.

### 6.2 Drainage Recommendations

- No action is recommended beyond ordinary homeowner maintenance and monitoring.

### 6.3 Recommendations for Maintenance (Standard)

The supporting soils at this residence may include components which shrink and swell with changing moisture content. For this reason, a maintenance program should be

AEI  708 W. Oakland St.  Broken Arrow, OK 74012  T 918-251-6910  F 918-251-8672  info@aeiengineering.net
Copyright © Associated Engineers & Inspectors Inc.

followed to include keeping the moisture content of soil around the foundation perimeter as uniform as possible. We generally recommend guttering roof drip edges over lawn areas. Exterior storm water and condensate drains should be extended 36-48" from the foundation perimeter, preferably downslope. Any low areas adjacent to the foundation should be filled. Do not operate sprinkler systems in wet weather (most systems do not have rain sensors).

## 7.0 CERTIFICATION

I hereby certify that I am a Professional Engineer licensed in the State of Oklahoma, that I have no personal interest in the inspected property nor anyone involved with the property, and that this inspection was performed in a diligent manner to accurately represent conditions on the date of inspection only. AEI is a registered engineering service provider in Oklahoma.

## 8.0 GENERAL LIMITATIONS

The observations described in the report are valid on the date of the investigation. AEI does not intend any other individual or party to rely upon the report without our express written consent. If another individual or party relies on the report, they shall indemnify and hold AEI harmless for any damages, losses, or expenses they may incur as a result of its use.

This report makes no determinations or representations regarding the presence or absence of any environmental pathogens. The subject property and facilities inspected are not recent construction. Various wall, floor, ceiling coverages and/or occupant belongings prevent observation of many surfaces. Concealed discrepancies and/or latent defects necessarily limit the accuracy and scope of this report.

This report does not represent any warranty, express or implied, and this company is not licensed to insure, warranty, or guaranty against future changing conditions. Any cost estimates are based on our general knowledge of building systems and the construction industry.

AEI and its employees and representatives do not have and disclaim any contractual relationship with, or any obligation to, any party other than the addressee of this report.

Please contact us if additional information becomes available for analysis, or if you have any questions.

Witness my signature and seal:

Shahriyar Ebady-Nezami, P.E.
Senior Engineer
Associated Engineers & Inspectors Inc.



**CONTRACTORS NOTE:**
1. ALL DIMENSIONS SHALL BE VERIFIED
2. LOCATION OF PIERS MAY VARY
   SLIGHTLY DUE TO FIELD CONDITION

**NORTH**

24'-6"

24'-6"

BACK PORCH

BACK ADDITION

TOTAL NUMBER OF INTERIOR
PIERS REQUIRED = 9

5'-6"   5'-6"

5'-6"   5'-6"

GARAGE

FRONT
ENTRANCE

DRIVEWAY

**PLAN VIEW**
NTS

| **DESCRIPTION:** | | 708 W. Oakland St.<br>Broken Arrow, OK 74012 | **DATE: 04/26/11** |
|---|---|---|---|
| EXTERIOR AND INTERIOR PIERS | **aei** | P 918.251.6910<br>F 918.251.8672 | **SK1** |
| **ADDRESS:**<br>1117 North Gum Ave.<br>Broken Arrow | | info@aieengineering.net | |

# EXHIBIT G



## SMITH, ROLFES
## & SKAVDAHL
COMPANY LPA

**Admitted to Practice:**

*Ohio*
*Kentucky*
*Florida*
*Michigan*
*District of Columbia*

**Matthew J. Smith, Esq.**
600 Vine Street, Suite 2600
Cincinnati, Ohio 45202
(513) 579-0080
msmith@smithrolfes.com

January 16, 2012

### *VIA ELECTRONIC MAIL*

Mr. Bryan C. Jones
Travelers Insurance
P.O. Box 35974
Tulsa, Oklahoma 74013

      Re:    *Robert Myers & Mary Myers v. Travelers (not in suit)*
             Claim No.:   HIL3690
             Our Clients:  Mr. Robert Myers and Ms. Mary Myers
             Date of Loss: April 25, 2011
             Our File No.: 11-12738

Dear Mr. Jones:

      As you are aware this firm, along with Scott L. Tully, Esq., represents Robert and Mary Myers with respect to the above-referenced claim. The purpose of this correspondence is to follow-up on our letter of December 30, 2011, and to confirm the substance of the January 13, 2012 telephone conversation between yourself and attorney Will Thomas of our firm.

      In our December 30th letter, we requested Travelers reverse its denial of coverage for the loss Mr. and Mrs. Myers sustained to their home, and to provide them coverage under their homeowner's policy. In our letter we advised Travelers incorrectly relied on a number of policy provisions and exclusions as the basis for its denial. We requested a response from Travelers within fourteen (14) days of receipt of our letter. To date, we have received no formal response.

      Based on the aforementioned telephone discussion, however, it is our understanding Travelers has received our correspondence and has referred it to its legal department for consideration. You advised although you were not certain as to when a response would be forthcoming, one should be expected within the next two (2) weeks. You further advised you

Mr. Bryan C. Jones
January 16, 2012
Page 2

would submit a reminder to the legal department regarding this matter. We appreciate your assistance in this regard.

We will wait an additional fourteen (14) days for a response from Travelers. However, we must remind you the Myers have incurred, and are continuing to incur, costs arising from their covered loss, and Travelers remains in breach of its obligations under the policy. Should we not receive a letter within fourteen (14) days from this date, we will advise our clients to consider other recourse to resolve this matter, including possible litigation.

Again, we are willing to work with Travelers to resolve this issue and look forward to your reply to our request. Please understand, however, nothing contained in this letter should be construed as a waiver of any rights the Myers have under their policy. The Myers specifically reserve all of their rights under the policy and at law.

Please also be certain to include Mr. Tully on all future correspondence.

Sincerely yours,

Matthew J. Smith

MJS/WCT:lp

cc:     Robert and Mary Myers *(via electronic mail)*
        Scott L. Tully, Esq. *(via electronic mail)*

# EXHIBIT H



# SMITH, ROLFES
# & SKAVDAHL
## COMPANY LPA

**Admitted to Practice:**

*Ohio*
*Kentucky*
*Florida*
*Michigan*
*District of Columbia*

**Matthew J. Smith, Esq.**
600 Vine Street, Suite 2600
Cincinnati, Ohio 45202
(513) 579-0080
msmith@smithrolfes.com

January 31, 2012

## *VIA ELECTRONIC MAIL*

Mr. Bryan C. Jones
Travelers Insurance
P.O. Box 35974
Tulsa, Oklahoma 74013

> Re: *Robert Myers & Mary Myers v. Travelers (not in suit)*
> Claim No.: HIL3690
> Our Clients: Mr. Robert Myers and Ms. Mary Myers
> Date of Loss: April 25, 2011
> Our File No.: 11-12738

Dear Mr. Jones:

As you are aware this firm, along with Scott L. Tully, Esq., represents Robert and Mary Myers with respect to the above-referenced claim. This correspondence follows our previous letters of December 30, 2011, and January 16, 2012.

In our December 30th letter, we informed Travelers it had incorrectly relied on a number of policy provisions and exclusions as the basis for denial of the Myers' claim. We requested a formal response fourteen (14) days from receipt of that letter. We received no response. In your conversation with Will Thomas of January 13, 2012, you advised the matter had been submitted to Travelers' legal department for consideration, and a response would be forthcoming within another two (2) weeks. In good faith, we relied on your representation and patiently awaited a response from Travelers. We again received no response.

We regret Travelers has delayed coverage to its insureds for an additional thirty (30) days with no reply to what is clearly an error in its coverage analysis. We have acted in good faith in delaying any legal action by our client against Travelers. Although we have extended this courtesy, we have received no such courtesy in return in the form of a response from Travelers.

Mr. Bryan C. Jones
January 31, 2012
Page 2

We shall now recommend our clients proceed with taking formal legal action including claims for breach of the insurance contract and bad faith. We anticipate suit shall be filed promptly and served upon your statutory agent.

Nothing contained in this letter should be construed as a waiver of any rights the Myers have under their policy. The Myers specifically reserve all of their rights under the policy and at law. We deeply regret Travelers' refusal to resolve this matter amicably, failure to abide by the terms of the insurance policy and failure to provide the promised response to our requests for coverage.

Sincerely yours,

Matthew J. Smith

MJS/WCT:lp

cc:     Robert and Mary Myers *(via electronic mail)*
        Scott L. Tully, Esq. *(via electronic mail)*